IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| TIMOTHY CHESNUT and JUSTIN BLAKE TOLAND, as Surviving Children of Lori Carroll, and on behalf of the Estate of LORI CARROLL, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. 4:15-CV-166-CDL |
| v. | ) ) | |
| CORRECTIONAL HEALTHCARE COMPANIES, INC. (a/k/a "CHC"), COLUMBUS, GEORGIA, SAI NANDAMURU, M.D., MARY WOODS, L.P.N., SGT. BRADFORD BRUNDAGE and LT. CATHA WILLIAMS, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

COME NOW Plaintiffs Timothy Chesnut (misspelled as "Chestnut" in the Complaint and court records) and Justin Blake Toland and hereby file this brief in opposition to all four motions for summary judgment filed against them by Defendants CHC, the city of Columbus, Dr. Nandamuru, Nurse Woods, Sgt. Brundage and Lt. Williams **(Doc. 31, 49, 50, 52)**, showing the Court as follows:

**SUMMARY OF ARGUMENT**

The following motions are pending before the Court:

1)      Nurse Woods has filed a motion for partial summary judgment (Doc. 49) on the Section 1983 claim for deliberate indifference to medical needs, but not on the state law negligence claim.  In response, Plaintiffs contend that there is a jury question as to whether Nurse Woods was deliberately

indifferent and it is undisputed that there is a jury question as to her negligence.

2)      Nurse Woods' employer, CHC, has filed a motion for summary judgment (Doc. 50) on grounds on that there is no *respondeat superior* liability under Section 1983, but that has no effect on CHC's *respondeat superior* liability on the state law negligence claim.  CHC also claims that is has no liability for punitive damages to the extent that it has been sued as a "functional municipality," but that is not the basis for the Plaintiffs' claim against CHC and has no bearing on CHC's liability for punitive damages under state law.  In response, Plaintiffs contend that CHC has *respondeat superior* liability for the negligence of Nurse Woods, including any punitive damages assessed against her under state law, but there is no federal claim against CHC.

3)      Dr. Nandamuru has filed a motion for partial summary judgment (Doc. 43, 52) on the Section 1983 claim on grounds that he was not deliberately indifferent and his deliberate indifference was not the proximate cause of Lori Carroll's death, but not on the state law negligence claim.  In response, Plaintiffs contend that there is a jury question as to whether Dr. Nandamuru was deliberately indifferent and it is undisputed that there is a jury question as to his negligence.

4)      Lt. Williams and Sgt. Brundage have filed a motion for summary judgment (Doc. 31) on grounds that they are entitled to both official and qualified immunity, but they have been sued under Section 1983 and there is no state law claim against them.  In response, Plaintiffs contend that there is a jury question as to whether they were deliberately indifferent, and they have been sued in their individual capacity only.

5)      As part of the same motion filed by Lt. Williams and Sgt. Brundage (Doc. 31), the Columbus consolidated government (hereafter "CCG" or "the county") has moved for summary judgment on grounds that it has no *Monell*  liability for either the actions of Lt. Williams and Sgt. Brundage or for the medical decisions of CHC as final decisionmaker.  In response, Plaintiffs agree that CCG has no

*Monell* liability as to Williams and Brundage because they did not act pursuant to jail policy; however, there is a jury question as to whether the county is liable for the deliberate indifference of CHC as the jail's final decisionmaker with respect to decisions about inmate medical care.

No matter how the Court rules on the above motions, Defendants Woods, CHC, and Nandamuru agree that the case must go to trial on the state law negligence claims against them. Plaintiffs believe that there are also jury issues as to the above federal claims, but in the event that none of the federal claims survive summary judgment, Plaintiffs ask that the state law claims be dismissed without prejudice so that they can be filed in the State Court of Muscogee County.

## FACTS

Lori Carroll was the Plaintiffs' mother. After a long history of mental illness that was known to Defendants, she died a gruesome death in her cell in the Columbus-Muscogee County jail after repeatedly throwing herself against concrete and steel flooring, walls and fixtures while in a psychotic state – despite the fact that she was in an observation cell and should have either been restrained, continuously monitored, or transferred to a hospital. Two days earlier she had been arrested for approaching stopped cars and asking for a ride, and once she was in the jail on charges of disorderly conduct, she was repeatedly observed hallucinating, talking to people who were not there, and engaging in self-harming behavior which caused visible life threatening injuries. Such observations were made by various staff members and reported to the individual Defendants – a jail nurse, a psychiatrist, and two detention staff supervisors – who failed to respond appropriately despite having actual knowledge of a substantial risk of serious harm.[1]

---

[1] The basic operative facts are largely undisputed and are detailed in the sheriff's investigative report (Exhibits 1 and 2, filed herewith in two parts due to space limitations), along with the summary of facts in the expert report of Dr. Lawrence Mendel (Ex. 13). Rather than restating the entire chronology here, this brief focuses on the specific factual issues that are disputed on summary

The death of Ms. Carroll was thoroughly investigated by the sheriff of Muscogee County, whose report concluded as follows:

> Based on officer's accounts and medical statements, **there appears to be a deliberate indifference on the part of certain clinic personnel regarding Carroll's injuries.** C.O. Tidd and C.O. Griggs both specifically mention protuberances on Carroll's head, and C.O. Tidd made statements regarding serious injuries to Carroll's elbows and the fact that she urinated on herself. **They both made these observations known to nurse Woods who, according to reports, dismissed the information.** The only care rendered to Carroll besides injections of psychotropic medication was that Woods used wet gauze to clean off dried blood. In addition, **Dr. Nandamuru's treatment of Carroll was based on extremely limited encounters.**

(Sheriff's investigation, part 1, attached hereto as Exhibit 1, at p. 8) (emphasis added). Review of the jail's security video indicates that Dr. Nandamuru's alleged psychiatric evaluation of Ms. Carroll on October 22 only lasted **13 seconds**, and that Dr. Nandamuru refused to provide a detailed statement to the sheriff's investigators. (*Id.*).

Attached as Exhibits 3 through 12 are photographs taken by the sheriff's investigators that show the appearance of Ms. Carroll's body when she was found dead in her cell. The photographs are graphic and disturbing, but their probative value exceeds their prejudicial impact because they specifically depict the extent and multiplicity of her injuries. (Exhibits 3-12). They are not only relevant on the issue of damages, but they support the inference that her injuries were inflicted over an extended period during which proper intervention would have saved her.

Three experts have weighed in for Plaintiffs: Dr. Lawrence Mendel (a correctional medicine expert), Dr. Cheryl Wills (a psychiatrist experienced in correctional medicine), and Dr. Kris Sperry (the state's chief medical examiner, who performed the autopsy). The sum total of their testimony is that the medical care provided to Ms. Carroll not only fell below the standard of care, but it fell so far

---

judgment.

below the standard of care that it amounted to deliberate indifference as well as negligence.  It is also their expert opinion that Lori Carroll's death – which the medical examiner attributes to a collapsed lung that caused her to die a slow and agonizing death – was caused by Defendants' failure to prevent her known self-harming behavior.

Specifically, Dr. Mendel offers the following criticisms of the Defendants' treatment of the Plaintiffs' mother:

1. *The actions of Dr. Nandamuru, the psychiatrist who saw Carroll were below the standard of care.*

    a. *He admitted failure to check the records of Lori Carroll.  This is a routine expectation of medical care.  Crucial information was contained in her medical records and it is more likely than not that the failure to review this information allowed her condition to worsen causing it to become more difficult to treat.  In addition, he failed to make a specific diagnosis or initiate treatment.*

    b. *By the following day when he saw Lori Carroll again, her condition had deteriorated.  She was confused and hallucinating.  Involuntary psychiatric medications were indicated and were ordered but the medications had a limited effective duration.  Despite this, no further treatment, monitoring or notification parameters were established.*

    c. *Dr. Nandamuru's failure to verify which protocol was in use and assuming that a monitoring plan was already in place was far below the applicable standards of care.*

    d. *Drug withdrawal was considered as a possible cause and he testified that he ordered Ativan for this reason but his failure to evaluate for withdrawal at the initial encounter and implement an ongoing monitoring plan was negligent.*

        i. *By the time of the second encounter, her withdrawal had become severe.  Under the applicable standards of care, she should have been transferred to a hospital.*

    e. *Dr. Nandamuru told an investigator after the incident that Nurse Woods informed him about Carroll's nose laceration and that he ordered suicide precautions.  His failure to verify that direct supervision was implemented subjected Carroll to unnecessary pain and suffering.  This failure and the lack of follow-up was a direct factor in her subsequent death.*

2.   *The actions of Nurse Woods exhibited a total disregard for the standard of care.*

    *a.*    *In her deposition, Woods testified that after she administered an involuntary psychiatric medication, and that this was an uncommon occurrence. Despite this, she admitted that she did not inquire about the reason for the involuntary treatment.*

        *i.*    *Carroll's behavior remained the same. But Nurse Woods did not obtain an order for additional treatment until custody staff intervened and brought Carroll to the medical area.*

    *b.*    *Over the next three hours, Carroll's confusion escalated and she began to injure herself. No additional treatment was provided. Custody staff became concerned and transported Carroll to the medical area for the purpose of evaluating her injuries but Woods did not obtain vital signs or evaluate her injuries even though she admitted that there was "a lot of blood". Not even direct communication from custody staff to inform her about additional concerns caused her to evaluate Carroll.*

        *i.*    *Nurse Woods told Dr. Nandamuru that Carroll had sustained a nasal laceration. This injury was described as a "deep laceration" but the custody staff and resulted in blood being smeared on the cell walls. Nurse Woods should have consulted with the on-call clinician about the need for sutures as well has how to evaluate the injuries.*

    *c.*    *Dr. Nandamuru issued orders for suicide precautions. Under the applicable facility protocols, this should have resulted in constant supervision. Instead, 15-minute observation was implemented.*

    *d.*    *Woods admitted that she went by Carroll's cell after the injuries occurred and that Carroll was sitting quietly on the floor. Nurse Woods failed to enter the cell and did not evaluate or obtain vital signs Carroll even though it was apparent that she had sustained additional injuries that could be seen from outside of the cell. Instead of evaluating obvious injuries that were even apparent to the custody staff, she dismissed them as an "abrasion" and a small knot.*

    *e.*    *The consideration of the use of a restraint chair reflected a meritorious concern about the ability to protect Lori Carroll from further harm while Woods still had not evaluated the prior injuries that were readily apparent. Nurse Woods testified that she did not expect the Ativan to take affect for 1-2 hours and Carroll was continuing to sustain injuries. The inability to control her self-injurious behavior should have resulted in transfer to a hospital.*

    f.    *Nurse Woods failed to notify the night nurses about the need to evaluate Carroll's injuries or monitor her vital signs.*

    g.    *Nurse Woods failed to complete the evaluations required for five CHC protocols and failed to make arrangements for ongoing monitoring. The extent of her failure to comply with these directives suggests inadequate training and supervision.*

(Doc. 45 - Mendel Dep. 8/29/16 at Ex. 4, pp. 1-4). Dr. Mendel was also critical of treatment by other

CHC nurses who are not named as defendants but whose negligence can also be imputed to CHC:

*The actions of other CHC employees also fell below the applicable standards of care and contributed to the adverse outcome.*

    a.    *The nurse who evaluated Lori Carroll at intake failed to refer her to a clinician despite her request at the time of booking.*

        i.    *Carroll reported that she had been taking Xanax at the time of booking and had received this medication during prior incarcerations. Her prior records also showed long-term use.*

        ii.    *Facility protocol required documentation regarding the last use and monitoring for withdrawal symptoms as well as consultation with the physician or psychiatrist. Despite this requirement, she failed to obtain an adequate history regarding Carroll's use of benzodiazepines and failed to initiate monitoring for drug detox.*

        iii.    *The intake nurse also failed to refer Carroll to see the psychiatrist. According to the testimony of Officer Crawford, she was not on the list of patients to be seen by Dr. Nandamuru.*

    b.    *Nurse Practitioner Jeremy Petty observed psychotic behavior by Carroll on the morning of October 23 but did not check into the possibility of drug withdrawal as dictated by the protocol for acutely psychotic patients. As a licensed clinician, Petty had the ability to order medications and other measures to treat withdrawal.*

    c.    *Nurse Rayburn who came on duty after the departure of Nurse Woods also failed to obtain vital signs or examine Carroll.*

(Doc. 45 - Mendel Dep. 8/29/16 at Ex. 4, pp. 5-6).

Plaintiffs' psychiatric expert, Dr. Wills, has the following criticisms of Dr. Nandamuru:

*It is my opinion with reasonable medical certainty that Dr. Nandamuru's care of Lori Carroll was grossly deficient, fell below the standard of care and contributed to the death of Lori Carroll. My reasoning is as follows:*

a. *Dr. Nandamuru knew that, like all healthcare professionals in the jail, he was required to know and practice consistently according to the Correctional Healthcare Companies Clinical Protocols, which include protocols for Mental Health care. He knew that Correctional Healthcare Companies was responsible for setting the treatment protocols in the jail and that he could not safely and responsibly provide mental health services, and collaborate with nurses and other healthcare providers in the Jail, unless he adhered to the same protocols and practices in that setting that they did.*

*As a board certified psychiatrist, Dr. Nandamuru knew that his failure to follow jail psychiatric protocols would compromise the safety and well-being of all individuals confined there, including Ms. Carroll. These individuals did not have the ability to seek competent mental health care elsewhere. Dr. Nandamuru's intentional decision to disregard the Clinical Protocols fell below the standard of care; it caused the unnecessary prolongation of Ms. Carroll's extreme self-torture and emotional pain and suffering that resulted in her death. The following statement support this opinion.*

    i. *Dr. Nandamuru failed to follow protocol A12 - Medical Housing Infirmary – that describes the protocol for transferring person requiring "acute psychiatric management" to the medical infirmary for closer monitoring by nursing staff. The fact that he ordered injectable medication for Ms. Carroll affirms that she required this level of care. Had Dr. Nandamuru followed the protocol, Ms. Carroll would have received more frequent monitoring from nursing staff, her vital signs would have been checked at least every shift, and she likely would have been "classified as no improvement on three consecutive checks" which would have resulted her being "discharged" to a hospital - in accordance with the protocol - to receive a higher and more appropriate level of care. She would not have been subjected to prolonged self-torture and suffocation and she would not have died in the Jail.*

    ii. *Dr. Nandamuru chose not to follow Protocol K01 – Change in Behavior which requires says "Do not assume that this is a psychiatric problem until the patient is medically cleared." Had he followed the protocol, he would have ordered a medical evaluation for Ms. Carroll, when he ordered injectable medication for her, which he did twice. This would have allowed the medical professional on call to determine how best to manage and monitor the physical injuries that ultimately resulted in Ms. Carroll's death.*

     iii.   *Dr. Nandamuru chose not to follow Protocol L02 – Acutely Psychotic Patients which requires the clinician to determine if there is "a previous mental health history." Had he done so, he would have realized that Ms. Carrol had a history of bipolar disorder and that the behavior that she was exhibiting, especially prior to the second dosage of injectable medication, did not fit the pattern of her behavior during previous detainments in the Jail. This would have resulted in more close monitoring, likely psychiatric hospitalization, alleviation of her symptoms and suffering without her dying alone while being physically and emotionally tortured by her perceived demons in a jail cell.*

     iv.   *Although Dr. Nandamuru suspected that Ms. Carroll may have been using recreational substances, such as bendzodiazepines (e.g. alprazolam (Xanax®), diazepam (Valium®), lorazepam (Ativan®), clonazepam (Klonopin®), etc.), he disregarded Protocol L06 – Benzodiazepine Addiction that would have required nurses to obtain vital signs at least three times daily for two days. The protocol would have resulted in nurses monitoring Ms. Carroll more closely. She may have been hospitalized due to her mental status changes, repeated-self torture, and the nurses "inability" to obtain her vital signs. If this had been done, she would not have died a slow, painful death in jail on October 24, 2013.*

  b.  *Dr. Nandamuru failed to follow Protocol L12 – Suicide Intervention that requires inmates "who are an immediate risk for suicide (Level 1) [to] be placed on a full suicide watch status with constant supervision . . . . If [the] facility is unable to provide 24/7 direct supervision, initiate transfer to an outside facility."  Had this policy been followed, Ms. Carroll would have been watched constantly, with the cell door open, until she was reassessed by a psychiatrist or psychologist who would have determined if the level of precautions should have been adjusted. Corrections officers would have been in a position to halt the self-harm immediately, and Ms. Carroll would have been transferred to the hospital for further care before she died.*

(Doc. 47 - Wills Dep. at Ex. E, pp. 4-6).

Based on her experience supervising nurses in the mental health context and her familiarity

with the nursing standard of care in dealing with psychiatric patients in correctional settings, Dr.

Wills also offers expert opinions critical of Nurse Woods:

*It is my opinion with reasonable medical certainty that Nurse Woods' psychiatric nursing care of Lori Carroll was grossly deficient, fell below the standard of care and contributed to the death of Lori Carroll. My reasoning is as follows:*

a.  *Although Nurse Woods knew that she was required to follow the Correctional Health Care Companies Clinical Protocols for Mental Health care in the Muscogee County Jail, she made a conscious decision to disregard them. She knew that her failure to follow the protocols would compromise the safety and well-being of all individuals that were incarcerated there, including Ms. Carroll, because these individuals did not have the ability to seek competent care elsewhere. Nurse Woods' failure to comply fell below the standard of care and contributed to the unnecessary prolongation of Ms. Carroll's extreme self-torture, emotional pain and suffering, and death.*

1.  *Nurse Woods Chose not to follow Protocol A12 – Medical Housing Infirmary, which permitted her to house Ms. Carroll in Medical Housing for acute psychiatric management, even though Ms. Carroll met the criteria for admission. Nurse Woods failed to obtain vital signs every shift and failed to notify a higher level medical provider when she was unable to do so. She also failed to consult with Dr. Nandamuru regarding discharging Ms. Carroll to the hospital even thought her "condition status has (sic) been classified as - <u>no improvement</u> on three consecutive checks." Additionally, Nurse Woods failed to properly document and to communicate verbally her observations about Ms. Carroll, as is required by the protocol. This made it difficult for nurses who worked the next shift to ascertain the severity of Ms. Carroll's situation.  Had Nurse Woods complied with the protocol, Ms. Carroll's emotional and physical torture in the Jail would have been halted because she would have been released to the hospital where she could receive proper care and she would not have died in the Jail on October 24, 2013.*

2.  *Nurse Woods chose not to follow Protocol K01-Change in Behavior that required her to make "simultaneous referrals to medicine and psychiatry." The protocol also required Nurse Woods to obtain data about Ms. Carroll's past psychiatric history and the information was available in the Jail; Nurse Woods failed to do this. She was required but failed to note Ms. Carroll's "general appearance" including the bruises on Ms. Carroll's body, her "dark eyes," the response of her pupils to light, her speech patterns, and whether she could control her bowels and bladder. The conscious failure of Nurse Woods to document this information and to communicate it to other healthcare professionals fell below the standard of care and impeded consideration of psychiatric hospitalization for Ms. Carroll. This contributed substantially to Ms. Carroll's prolonged and unnecessary extreme emotional suffering and physical self-torture that preceded her death in the Jail.*

3.  *Nurse Woods consciously disregarded Protocol L2 – Acutely Psychotic Patients, which required her to ascertain Ms. Carroll's previous mental health and substance misuse history. The Protocol also required Nurse Woods to assess Ms. Carroll's vital signs, how her pupils reacted to light and whether or not she had control of her bowels and bladder. Had Nurse Woods*

compiled, the medical professional on call, the psychiatrist, (Dr. Nandamuru) and the Health Services Administrator would have been aware of Ms. Carroll's incontinence and visual changes. Nurse Wood's failure to follow through with her professional obligations fell below the standard of care and contributed to Ms. Carroll's extreme, prolonged and unnecessary emotional and physical self-torture that resulted in her death in the Jail.

4.    Nurse Woods consciously disregarded Protocol L11 – Psychiatric Medication, which required the following interventions for a patient who "is evidencing psychotic behaviors, is extremely agitated _and_ presents a danger to self or others in an emergency situation:" obtain and document vital signs, orientation, "neuro check" and "history of head trauma if known." Nurse Woods was required to "document. . . the specific behaviors leading to the initiation of the medication" and to house Ms. Carroll "in an area where continuous monitoring is available." She was supposed to check Ms. Carroll 15 minutes after giving the medication and every hour thereafter." She was required to document these interventions and her observations. Nurse Woods was supposed to document the condition of Ms. Woods' extremities (arms and legs) in the identified space on the Psychiatric Medication Problem Oriented Record (POR). Also, the POR form that she was supposed to complete contains a section titled "Call Emergency Ambulance" to facilitate documenting the process of arranging for the patient to be hospitalized. Nurse Woods' failure to comply with the protocol for Psychiatric Medication fell below the standard of care and contributed to Ms. Carroll's prolonged and unnecessary emotional and physical self-torture and her death in the Jail.

5.    Nurse Woods failed to follow Protocol L12 – Suicidal Intervention, which required her to place Ms. Carroll on a Level 1 full suicide watch with 24/7 direct supervision or to "initiate transfer to an outside facility" if there were not sufficient resources to monitor Ms. Carroll properly. Had Nurse Woods complied, Ms. Carroll would have been monitored more closely and would have been prevented from engaging in the violent and repeated physical and emotional self-torture that caused her to die. Nurse Wood's actions fell below the standard of care and contributed to Ms. Carroll's death.

6.    Nurse Woods' failure to consider use of the restraint chair when asked to do so represents an exercise in poor judgment and would not have contributed to Ms. Carroll's death had Nurse Woods complied with the Correctional Healthcare Companies Clinical Protocols for Mental Health. Thus, her failure to properly review the request for a restraint chair, including the situation which resulted in the request, with Dr. Nandamuru fell below the standard of care and contributed to Ms. Carroll's repeated and prolonged physical and emotional self-torture that ended in her death.

(Wills expert report attached hereto as Exhibit 14, pp. 7-10).[2]

Dr. Sperry's autopsy concluded that the cause of death was a collapsed lung which would have taken at least one to two hours to kill her.  (Doc. 48 - Sperry Dep. 50-53).  Had Ms. Carroll been properly monitored, her injury would have not only been obvious from her vital signs, but it would have been both visible and audible to even an untrained observer, because her breathing would have been loud and shallow and she would have shown signs of panic and extreme pain.  (*Id.*). She would not have suffered the collapsed lung at all had she been placed under one-on-one observation in the first place, or had she been restrained hours earlier as discussed between Nurse Woods and jail supervisors – who "would have been in a position to halt the self-harm immediately" and transfer her to a hospital.  (Doc. 47 - Wills Dep. at Ex. E, p. 6; see also Exhibit 14 hereto at pp. 6-10).   Dr. Mendel summarizes the causation issue as follows:

> *The death of Lori Carroll in the custody of the Muscogee County Jail should never have occurred. Her psychosis was never adequately treated and her condition progressively deteriorated causing her to sustain multiple, recurrent injuries.  Her dangerous behavior was observed for hours but measures to protect her from harm were not implemented.   Her injuries were readily observable but her physical condition was not evaluated or monitored.   These injuries were treatable but **the failure to evaluate and treat her injuries resulted in her death.***

(Doc. 45 - Mendel Dep. 8/29/16 at Ex. 4, p. 6) (emphasis added).  In short, there is expert opinion in support of all elements of the Plaintiffs' claims against the Defendant medical providers.

In addition to the medical Defendants, Plaintiffs have sued two jail supervisors – Lt. Williams and Sgt. Brundage – for deciding that they did not have the authority to put Lori Carroll in a restraint chair for her own protection despite the fact that jail policy explicitly authorized them to

---

[2] Although Dr. Wills' report is also Exhibit E to her deposition, there appear to be pages missing from the electronic copy provided by the court reporter, so Plaintiffs have separately filed the entire report as Exhibit 14 to this brief.

do so.  (Doc. 45 - Mendel Dep. 8/29/16 at Ex. 5; Doc. 50-3, p. 8).   It is undisputed that Williams and

Brundage knew of her self-harming behavior and discussed putting her in the restraint chair – not

only with each other but with Nurse Woods – but they decided they did not have the authority to do

so even though their policy explicitly authorized them to do so and even though they knew that

Nurse Woods was not willing to do it.  (Doc. 33 - Brundage Dep. 9-10, 23; Doc. 34 - Williams Dep.

7-9, 13).  Sgt. Brundage told investigators that if Ms. Carroll could not be put in the restraint chair,

she should have been taken to the hospital, but that did not occur either.  (Exhibit 1 hereto, p. 149;

Exhibit 2 hereto, p. 150; Doc. 33 - Brundage Dep. 30).  The jury could find that the failure of Lt.

Williams and Sgt. Brundage to follow their own policy constituted deliberate indifference to a

known risk of serious harm which – along with the negligence and deliberate indifference of the

medical staff – proximately caused Ms. Carroll's tragic death at the age of 46.

## LEGAL ARGUMENT

**A.      There is a jury question as to whether Nurse Woods was deliberately indifferent under federal law, but it is undisputed that there is a jury question as to her negligence under state law.**

There can be no question that Nurse Woods and others were negligent in their treatment of Lori

Carroll's condition, and no one has suggested otherwise in these summary judgment motions.  The

issue before the Court is whether the clear evidence of negligence in this case also rises to the level of a

federal constitutional violation – or, more precisely, could reasonable jurors infer that to be the case?

The answer to that question will determine whether this case remains in federal court – and whether

Plaintiffs are entitled to attorney's fees under 42 U.S.C. §1988 – or whether the case will be tried as a

medical malpractice action in state court.

The federal Constitution imposes a duty upon jail and prison officials not to be deliberately

indifferent to an inmate's serious medical needs. *Estelle v. Gamble*, 42 U.S. 97 (1976); *Mandel v. Doe*, 888 F. 2d 783 (11th Cir. 1989); *Waldrop v. Evans*, 871 F. 2d 1030, 1033 (11th Cir. 1989).   The "deliberate indifference" standard applies to both pretrial detainees (under the Fourteenth Amendment) and convicted prisoners (under the Eighth Amendment).  *Lancaster v. Monroe County*, 116 F. 3d 1419 (11th Cir. 1997); *Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F. 3d 1176, n. 19 (11th Cir. 1994).

'Deliberate indifference' has three (3) components:  "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than negligence."  *McElligot v. Foley*, 182 F. 3d 1248 (11th Cir. 1999).  The only subjective requirement of deliberate indifference is that the defendant have actual knowledge of a risk of serious harm, while the disregard of that risk is an objective fact that can be inferred from the evidence.  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *see also Marsh v. Butler County, Ala.*, 268 F. 3d 1014, 1028 (11th Cir. 2001) (*en banc*) (quoting *Farmer*, 511 U.S. at 844)).  In *Marsh*, the full Eleventh Circuit defined "deliberate indifference" as where there is "a substantial risk of serious harm, of which the official is subjectively aware, … and the official does not respond reasonably to the risk."  The element that "the official does not respond reasonably to the risk" does not equate to negligence because the risk is known, whereas negligence is based on what a reasonable person should have known.  In other words, the failure to respond reasonably to a known risk of serious is not inconsistent with *McElligot*'s requirement of conduct that is "more than negligence;" rather, the *en banc* court's version of the definition in *Marsh* is a clearer and less confusing articulation of the standard.

The duty is no different where the risk of serious harm is self-inflicted.  Accordingly, jail and prison officials cannot act with deliberate indifference to an inmate's suicidal threats under the Eighth Amendment (which applies to convicted prisoners) or the Fourteenth Amendment (which applies the same "deliberate indifference" standard in a pretrial detention context).  *See Greason v. Kemp*, 891 F.

2d 829 (11th Cir. 1990) (deliberate indifference to inmate's suicide threats violated plaintiff's clearly established constitutional rights in 1985).   It is clearly established law that jail employees cannot be deliberately indifferent to an inmate's attempts or threats to kill herself.  *Edwards v. Gilbert*, 867 F. 2d 1271 (11th Cir. 1989).  Whether Lori Carroll's self-harming behavior is viewed as a risk of serious harm or as a serious medical condition, the same deliberate indifference standard applies.

In the medical context, deliberate indifference means that it is necessary to prove more than mere negligence or medical malpractice, but subjective bad intent is not required.   It is clearly established law in the Eleventh Circuit "that an official acts with deliberate indifference when [he or she] delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition **or** an urgent medical condition that would be exacerbated by delay."  116 F. 3d 1419.  Deliberate indifference may be inferred when jail personnel ignore without explanation a prisoner's serious medical condition that is known or obvious to them.  *Thomas v. Town of Davie,* 847 F.2d 771, 772-73 (11th Cir. 1988).  While deliberate indifference requires "more than mere negligence," it is not necessary to prove the absence of any care at all.  "Grossly incompetent or inadequate medical care can violate the Eighth Amendment." *Rogers v. Evans*, 792 F.2d 1052, 1062 (11th Cir. 1986).

> Medical treatment that is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness' constitutes deliberate indifference….   Additionally, when the need for medical treatment is obvious, **medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference**….

*Adams v. Poag*, 61 F.3d 1537, 1543-44 (11th Cir. 1995) (emphasis added)*; see also McElligott*, 182 F.3d at 1256-57 (11th Cir. 1999) (jail doctor and nurse could be found liable for Eighth Amendment violation where jury could conclude that their grossly negligent conduct in failing to diagnose inmate's terminal cancer might rise to the level of deliberate indifference).

It is well settled law that in a prison or jail setting, privately employed contract medical providers are state actors who can be liable under the Eighth and Fourteenth Amendments for "deliberate indifference" to a "serious medical need."[3]  *West v. Atkins*, 487 U.S. 42 (1988); *Farrow v. West*, 320 F.3d 1235,1244-45 (11th  Cir. 2003) (private doctor who contracted with prison to provide medical services for inmates was "state actor" and "deliberately indifferent" to inmate's "serious medical needs" for unreasonable fifteen-month delay in providing plaintiff with dentures); *Carswell v. Bay County*, 854 F.2d 454, 456-57 (11th Cir. 1988) (private doctor under contract to provide medical services in a county jail was liable for deliberate indifference for his failure, in conjunction with the nurse he supervised, to treat a diabetic inmate); and *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (complaint against private medical service provider was sufficient to survive dismissal for "deliberate indifference" under 42 U.S.C. § 1983).

Based upon the above testimony of Plaintiffs' experts, Nurse Woods not only failed to meet the standard of care, but her conduct fell so far below the standard of care as to constitute "medical care that is so cursory as to amount to no treatment at all," which  would authorize a finding of deliberate indifference.   *Adams*, 61 F.3d at 1544.  The fact that Nurse Woods dismissed statements made by others about Ms. Carroll's injuries, the fact that she failed to examine her and take vital signs even after Carroll calmed down and appeared to be sleeping, the fact that she failed to approve putting Carroll in a restraint chair when asked to do so by supervisors or to communicate that concern to the

---

[3] Even though private contractors acting under color of state law can be sued under Section 1983, it should be noted that they cannot assert the defense of qualified immunity. *Richardson v. McKnight*, 521 U.S. 399 (1997) (privately employed prison guards are state actors but are not entitled to claim qualified immunity).   Based upon the Supreme Court's decision in *Richardson*, the Eleventh Circuit has held that contract medical providers who are not themselves public officials cannot assert qualified immunity as a defense.   *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999), *op. amended by* 205 F.3d 1264 (11th Cir. 2000) ("no strong reason appears in this case to distinguish between privately employed prison guards and privately employed prison physicians").

doctor, and the fact that she did not put Carroll on continuous observation as required by protocols all support an inference that she was deliberately indifferent and not merely negligent.

**B.    CHC has *respondeat superior* liability for the negligence of Nurse Woods and other CHC employees, including any punitive damages under state law, but there is no federal claim against CHC.**

CHC is correct that it has no liability for federal civil rights violations unless Nurse Woods or others violated constitutional rights pursuant to an official custom or policy of CHC.    *Monell v. Department of Social Servs*., 436 U.S. 658 (1978).  While the Complaint does allege that there were deficiencies in CHC policies for which both CHC and the county are liable, Plaintiffs' experts have since opined the policies and protocols put in place by CHC were adequate and that Ms. Carroll would not have died if the medical providers had followed them.  Accordingly, to the extent that the Complaint can be read as alleging a claim against CHC itself for federal civil rights violations, that claim is hereby withdrawn.   However, Plaintiffs do have a *Monell* claim against the county (CCG) for treatment decisions made by CHC in its capacity as the county's final decisionmaker with respect to inmate medical care.  (See discussion of final decisionmaker claim against CCG in section E of this brief).

The fact that there is no *respondeat superior* liability for federal civil rights violations under has no bearing upon state law.  The allegation that CHC, as final decisionmaker with respect to inmate care, is a conduit for county liability for purposes of federal law does not change the fact that CHC is a private actor under state law which may be sued in the same way as any other corporate tortfeasor.  Because Georgia law provides that employers are liable for the acts of their employees within the scope of employment – including punitive damages for conduct that meets the requirements of O.C.G.A. §51-12-5.1 – CHC can be held liable for the negligence of Nurse Woods under state law.  CHC can also be held liable under state law for the negligence of any other CHC

employees, whether they are individually named as Defendants or not, identified through discovery. (Doc. 45 - Mendel Dep. 8/29/16 at Ex. 4, pp. 5-6).

Accordingly, CHC is liable for the actions of its employees under state law but has no liability under federal law.  However, this has no impact upon the individual liability of its employee, Nurse Woods, under federal law, nor upon the *Monell* liability of the county for decisions made by CHC employees under final decisionmaking authority delegated by the county to CHC under federal law.

**C.   There is a jury question as to whether Dr. Nandamuru was deliberately indifferent under federal law, and whether his deliberate indifference proximately caused Ms. Carroll's death, but it is undisputed that there is a jury question as to his liability under state law.**

Like Nurse Woods, Dr. Nandamuru concedes that there is a jury question as to whether the was negligent under state law.   The same deliberate indifference standard, discussed above in section A, governs the question of whether he can also be held liable under federal law.

In the words of Judge Royal, who authored the leading treatise on medical malpractice in Georgia, "a plaintiff may establish deliberate indifference by offering testimony of medical experts opining that "the official's actions were so grossly contrary to accepted medical practices as to amount to deliberate indifference." *Robinson v. Integrative Det. Health Servs.*, No. 3:12-CV-20 (CAR), 2014 U.S. Dist. LEXIS 41688, at *39 (M.D. Ga. Mar. 28, 2014).   Based on the testimony of Dr. Mendel and Dr. Wills, reasonable jurors could find that Dr. Nandamuru's clear negligence rose to the level of deliberate indifference because he failed to check Ms. Carroll's medical records on file at the jail, he failed to make a diagnosis or treatment plan, he failed to give clear orders about how she was to be monitored without any familiarity with the facility protocols on how his orders would be carried out, failure to follow-up on the implementation of his orders, failure to give instructions

on when he was to be notified, and failure to familiarize himself with CHC protocols that all nurses under his supervision were required to follow. *See Robinson*, 2014 U.S. Dist. LEXIS 41688, at *39-42 (jail medical provider's failure to adequately monitor or follow up on inmate's condition could be deemed deliberate indifference). That is consistent with Eleventh Circuit rulings that "grossly incompetent or inadequate medical care" amounts to deliberate indifference where it is tantamount "to no care at all." *Rogers v. Evans*, 792 F.2d 1052, 1062 (11th Cir. 1986); *Adams v. Poag*, 61 F.3d 1537, 1543-44 (11th Cir. 1995).

Dr. Nandamuru also contends that even if he were deliberately indifferent, his deliberate indifference would not have been the proximate cause of Ms. Carroll's death because she died of a collapsed lung that occurred subsequent to his psychiatric evaluation of her.   Whether the instrumentality of death was a self-induced lung puncture or a rope around the neck, her death was a foreseeable consequence of the doctor's failure to respond appropriately to her serious medical needs.  In other words, Dr. Nandamuru has not been sued for failure to treat the collapsed lung but for failure to treat the psychotic condition that caused her to suffer the collapsed lung.  She would not have suffered the collapsed lung at all had she been placed under one-on-one observation in the first place, or otherwise received proper mental health evaluation with appropriate follow-up and monitoring of vital signs.   (Doc. 47 - Wills Dep. at Ex. E, p. 6; Doc. 45 - Mendel Dep. 8/29/16 at Ex. 4, p. 6).  Even if Ms. Carroll were properly evaluated and followed by Dr. Nandamuru but were still somehow able to suffer a collapsed lung, continuous observation and periodic vital signs would have put the staff on notice of the collapsed lung long before it progressed to the point that it killed her.  Collapsed lungs rarely cause death because they are a slow process, and appropriate evaluation and treatment would have either prevented it from occurring or caused it to be detected in time to save her life.  (Doc. 48 - Sperry Dep. 50-53).

**D.    There is a jury question as whether Lt. Williams and Sgt. Brundage in their individual capacities were deliberately indifferent under federal law – for which they are not entitled to qualified immunity because they violated clearly established law – but there is no state law claim against them.**

A jury could similarly find that two jail supervisors, Lt. Williams and Sgt. Brundage, also had knowledge that Lori Carroll was at substantial risk of harm.  They were both told by their subordinates that Ms. Carroll was engaged in self-harming behavior, but they did not take action to eliminate the risk other than discussing it among themselves and Nurse Woods – and then taking no further action whatsoever once Nurse Woods told them that she did not have the authority to put Ms. Carroll in a restraint chair to prevent further harm.  At that point, Williams and Brundage could have followed their own policy, which expressly authorized shift commanders to put inmates in a restraint chair to protect them from self-harm, but they inexplicably failed to do so.  Just because they did *something* by reporting the situation to Nurse Woods, that did not discharge their continued duty to protect Ms. Carroll from a known risk of serious harm once it was evident that Nurse Woods was not going to intervene – particularly when the jail's restraint chair policy authorized them to take action whether the medical staff did so or not.  Reasonable jurors could find that this was deliberate indifference – either to a known risk of harm or to a serious medical need – for the reasons discussed in previous sections.

Williams and Brundage are sued under federal law in their individual capacities only.  The summary judgment motion filed by Williams and Brundage asserts that they are entitled to both official and qualified immunity, but official immunity is a state law defense that does not apply because they have not been sued under state law.  The applicable defense to the federal claims against them would be qualified immunity, but they are not entitled to it because, viewing the facts in the light most favorable to Plaintiffs, they violated clearly established law.

The doctrine of qualified immunity protects individual government employees from monetary liability under 42 U.S.C. §1983 for conduct that does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury show the officer's conduct violated a federal right…. The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. Courts have discretion to decide the order in which to engage these two prongs. This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  In making that determination, a court must view the evidence in the light most favorable to the opposing party.

*Tolan v. Cotton*, 134 S. Ct. 1861, 1865-1866 (2014) (internal citations and punctuation omitted).  In *Tolan*, the Supreme Court admonished courts to view all facts and inferences in the light most favorable to the plaintiff's position in ruling on the qualified immunity issue:

> Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong of the standard. In cases alleging unreasonable searches or seizures, we have instructed that courts should define the "clearly established" right at issue on the basis of the "specific context of the case." Accordingly, courts must take care not to define a case's "context" in a manner that imports genuinely disputed factual propositions.

*Id.* at 1866 (internal citations omitted).

The law is clearly established if a reasonable officer had 'fair warning' of what the law required at the time of the subject incident in 2013.  One way to show 'fair warning' is by pointing to

a prior case with similar facts, but that is not the only way to do so. *See, e.g., United States v. Lanier*, 520 U.S. 259, 271 (1997) (recognizing that a general rule may apply with "obvious clarity to the specific conduct in question," even though the challenged conduct has not previously been held unlawful); *accord Hope,* 536 U.S. at 741. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). All that is required is that "in the light of pre-existing law, the unlawfulness must be apparent." *Id.* The "salient question" is not whether there is a binding precedent which is factually on "all fours" with the case at bar, but whether the contours of the law which existed at the time of the incident were sufficiently clear to give a reasonable law enforcement officer "fair warning" that he or she could be liable under the circumstances. *Hope*, 536 U.S. at 741 (citing *Lanier*, *supra*).

Even in the absence of a factually similar precedent, where "the official's conduct lies so obviously at the very core of what the [Constitution] prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law," the official is not entitled to the defense of qualified immunity." *Priester v. City of Riviera Beach*, 208 F. 3d 919, 924 (11th Cir. 2000), citing *Smith v. Mattox*, 127 F. 3d 1416, 1419 (11th Cir. 1997). That is consistent with the Supreme Court's ruling in *Hope* that factually similar precedent is not required if "a general constitutional rule already identified by the decisional law" is articulated with sufficient clarity that it is not dependent upon the peculiar facts of the case from which it arose. *Hope,* 536 U.S. at 741.

> [I]f some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional without tying that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle:  put differently, the precise facts surrounding "X Conduct" are immaterial to the violation.  **These judicial decisions can control "with obvious clarity" a wide variety of later factual circumstances.**

*Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (citing *Hope* and *Lanier, supra*) (emphasis added).  Because there is a rule laid down by case law that applies with obvious clarity to the conduct as alleged by Plaintiffs, no reasonable jail supervisor would have believed that it was lawful to allow a psychotic inmate engaged in self-harming behavior to continue to harm herself to the point of serious bodily injury and death.

Applying the above principles in the factual context of this case, it is clearly established law in the Eleventh Circuit that jail employees cannot be deliberately indifferent to an inmate's suicidal or self-harming behavior.  *Edwards v. Gilbert*, 867 F. 2d 1271 (11th Cir. 1989).  It is clearly established "that an official acts with deliberate indifference when [he or she] delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition **or** an urgent medical condition that would be exacerbated by delay."  116 F. 3d 1419.  Deliberate indifference may be inferred when jail personnel ignore without explanation a prisoner's serious medical condition that is known or obvious to them.  *Thomas v. Town of Davie,* 847 F.2d 771, 772-73 (11th Cir. 1988).  The inexplicable fact that Lt. Williams and Sgt. Brundage were aware of Lori Carroll's self-harming behavior – and viewed it seriously enough to ask Nurse Woods to put her in protective restraint – but then proceeded to do nothing about if after the nurse refused to intervene would be a clear violation of established Eleventh Circuit law if the jury found that was in fact what occurred.  Because Plaintiff's factual allegations against Defendants Williams and Brundage, if proven, would constitute a violation of legal principles of which any reasonable jailer should have been aware, said Defendants are not entitled to summary judgment on the issue of qualified immunity.

**E.**    **While CCG has no municipal liability for the deliberate indifference of Lt. Williams and Sgt. Brundage, there is a jury question as to whether CCG has municipal liability as the jail's final decisionmaker with respect to inmate medical care.**

The Complaint asserts a municipal liability claim against the county (CCG) based on both the

conduct of Lt. Williams and Sgt. Brundage as well as that of its jail medical provider, CHC. However, discovery has revealed that there were no policy deficiencies that were a moving force behind the deliberate indifference of Williams and Brundage because jail policy clearly authorized them to put Lori Carroll in a restraint chair but they failed to act in accordance with that policy. Since there is no *respondeat superior* liability under Section 1983 and there is no evidence that county policy caused Williams and Brundage to violate constitutional rights, Plaintiffs agree to withdraw their claim against the county on that basis.4  However, Plaintiffs continue to maintain that the consolidated city and county government of Columbus (CCG) is liable for deliberate indifference of CHC and its employees with respect to their care of Ms. Carroll in the county jail for the reasons discussed below.

It is axiomatic that there is no *respondeat superior* liability under 42 U.S.C. §1983, and that a county or municipality can only be held liable for federal civil rights violations if the plaintiff's rights were violated pursuant to an official custom or policy.  *Monell v. Department of Social Servs.*, 436 U.S. 658 (1978).  A county can be subject to *Monell* liability if the inmate's rights were violated pursuant to a custom or policy of the medical contractor that was "tantamount to official county policy." To establish *Monell* liability for a state actor who was not a final decisionmaker, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) a causal link between the policy or custom and an alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  It is not necessary that the policy or custom be unconstitutional on its face, only that it be the moving force behind the constitutional violation at issue. *Id.* Rather, it is only necessary that the policy or custom be a "moving force" behind the alleged deprivation of the plaintiffs's rights.

---

4 Stated differently, there is no claim against Williams and Brundage in their official capacities.

*Oklahoma City v. Tuttle*, 471 U.S. 808 (1985).  The Supreme Court has not defined the term "moving force," but the Court has stated that there must, at the very least, be an "affirmative link" between the policy and the constitutional violation, and it has been generally equated with the concept of proximate cause.  471 U.S. at 823; *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

There is a special category of *Monell* liability in which a county or municipality is liable for the unconstitutional conduct of certain officials whose actions are deemed to represent official policy.  Under the so-called "final decisionmaker" line of cases, the county may be subject to *Monell* liability for civil rights violations that result from the decisions of a policymaker or final decisionmaker in whom county authority is vested with respect to the particular governmental function at issue.  *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989). **In the context of providing medical care to inmates, the Eleventh Circuit has held that a contract medical provider such as CHC can be deemed a final decision-maker so as to impute liability to the county for its decisions resulting in constitutional violations.** *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985).

The federal courts have consistently ruled that governments, state and local, have an obligation to provide medical care to incarcerated individuals. Because the governmental entity cannot absolve itself of this duty by contracting with an private entity to perform an obligation owed by the entity, it remains liable for any constitutional deprivations caused by the policies or customs of the health service. In that sense, the county's duty is non-delegable. To the extent that a decision made by the contractor would be unconstitutional it were made by a final decisionmaker such as the sheriff or county commissioners, it is a similarly a constitutional violation if made by a contractor under authority delegated by the county.

> However, if a constitutional tort committed by an employee of Prison Health Services
> was not a result of the policy or custom of the entity, then the county would not be
> liable. Liability for the independent actions of a health service employee would be
> based upon *respondeat superior* and thus not actionable against the county under §
> 1983.

*Ancata*, 769 F.2d at 706, n. 11.

For a case that illustrates the application of *Ancata* to a similar fact pattern, see Judge Royal's

decision in *Robinson v. Integrative Det. Health Servs.*, No. 3:12-CV-20 (CAR), 2014 U.S. Dist.

LEXIS 41688 (M.D. Ga. Mar. 28, 2014).  In *Robinson*, the district court determined that there was

sufficient evidence that the county had delegated final decision-making authority to the medical

contractor, noting as follows:

> In determining whether final policymaking authority has been delegated to a private
> entity, the Eleventh Circuit instructs courts to look at the contract between the parties
> outlining their responsibilities. Under the terms of the contract with the County,
> IDHS promised to provide all medical services to the inmates at the jail and to
> provide all corresponding administrative services. No provision in the contract
> requires that IDHS report to Sheriff Cleveland, the jail administrator, or any other
> county official regarding the quality of medical services or the manner in which those
> services are provided. Thus, the contract suggests IDHS's decisions were not subject
> to meaningful administrative review.

*Robinson v. Integrative Det. Health Servs.*, No. 3:12-CV-20 (CAR), 2014 U.S. Dist. LEXIS 41688,

at *29-30 (M.D. Ga. Mar. 28, 2014).  *Robinson* settled after trial and was never reviewed on appeal,

but it has been favorably cited in all three federal districts in Georgia.

The medical contractor in *Robinson* – like CHC in this case – had had created its own "policy

and procedure manual governing the manner in which it would provide medical services at the jail."

*Robinson* at *30-31.

> Neither the Sheriff nor any other county official was required to sign off on these
> policies and procedures before putting them into force. In fact, both Sheriff Cleveland
> and Captain Milford testified that they defer to IDHS and [its nurse] to make all
> decisions regarding inmate medical care at the jail. The Sheriff did not maintain any
> separate policies or procedures regarding the provision of inmate medical care, and

26

the record is devoid of any evidence showing [IDHS] decisions regarding the quality of care was subject to meaningful administrative review.

*Id.*  That fact led Judge Royal to the following conclusion:

> The Court thus finds that Sheriff Cleveland and the County did in fact delegate final authority with respect to inmate medical care, diagnosis, and treatment to IDHS and Bailey. **When a county delegates final policymaking authority to a private entity regarding inmate medical care, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the private entity. Municipal liability under this theory is not based on *respondeat superior*, but rather the idea that the acts, policies and customs of the private entity become official policy when the private entity acts as the final decision maker for the municipality.**

*Id.* at *32-33 (citing *Ancata, supra*) (internal punctuation omitted) (emphasis added).

The Court can make a similar finding in the case at bar.  According to the Muscogee County

sheriff, the sheriff's inherent authority over medical treatment in the county jail has been delegated to

the medical contractor, CHC, as demonstrated by the following passages from his deposition:

> Q.   Well, the CHC people don't work for you; do they?
> A.   No, sir.  No, sir.  But it -- no, sir, they do not.  No, sir.
> Q.   Do you have any control over the CHC people as far as, you know, when they work or who they assign to -- to show up or that type of thing?
> A.   The best way to answer that, Mr. Jones, is no, sir, I don't dictate how CHC does their -- their part of it.  What I have control of, when it comes to their involvement in the county jail, is I can dictate who comes into the jail that works for them.
> Q.   Uh-huh.  (indicating in the affirmative)
> A.   And then also to make sure that their practices are in line with -- for me, I would say, jail security --
> Q.   Right.
> A.   -- in making sure that's in cohesiveness for the running of the jail.
> Q.   So basically as a sheriff, you're ultimately responsible for the security of the jail; right?
> A.   Yes, sir.
> Q.   And the overall operations of the jail; right?
> A.   Yes, sir.
> Q.   But with respect to how the medical staff does their job, do you have any control over that?
> A.   I would say -- in my opinion, Mr. Jones, I would say think it would be -- is very limited.  What we try to make sure is, what they do is in line for best -- like I

said, really from a security standpoint.

Q.   Right.

A.   You know, I'm not telling them how many people that they need to, let's say, dispense medication. I just need to make sure that that medication is being dispensed to who it needs to be dispensed to….

Q.   [W]ould it be fair to say now that you have a medical contractor, you have essentially delegated all the medical functions to that -- that company?

A.   I would say we're looking to them to provide a lot of the expertise, yes, sir --

Q.   Yeah.

A.   -- on the medical care, yes, sir.

Q.   Well, aren't they really making all the decisions about the medical care?

A.   I would say not every -- no, sir, I wouldn't say that one hundred percent.  No, sir.

Q.   They don't call you up and say should we give this guy four Tylenols or three; do they?

A.   No, sir.  No, sir.  And what I -- and what I meant -- I guess the best I want to answer that, Mr. Jones -- and I might be using an extreme example.

Q.   Uh-huh.  (indicating in the affirmative)

A.   If something happens to an inmate, he breaks his arm and the bone is sticking out --

Q.   Uh-huh.  (indicating in the affirmative)

A.   -- and for whatever reason CCS says well -- now, whatever their decision is, is not to maybe take him to the hospital or something.[5]

Q.   Uh-huh.  (indicating in the affirmative)

A.   And I do think we might have a -- I would think we have a level of expectations to get that --making sure that's taken care of so we can then say well, I'll tell you what, we're going to send him to the hospital.  We're providing the transportation anyway, so we can -- we can do that.

Q.   Transportation and security.

A.   Yeah.

Q.   Even if it's an ambulance, you're going to have to --

A.   Yes, sir.

Q.   -- have an officer with them; right?

A.   Yes, sir.  And I know that's an extreme example.  But that is an example of where --

Q.   I think it's -- I think it's a good example.

---

[5] In *Robinson, supra*, Judge Royal noted that "calling an ambulance in cases of an unexpected emergency is irrelevant to the responsibility of providing routine medical services at the jail," concluding that the county had delegated final decisionmaking responsibility for medical care to the jail's medical contractor even though the detention staff was still free to act in emergencies.  2014 U.S. Dist. LEXIS 41688 at *32.

A.   -- that we -- we'd have to sit there and say -- so I -- to sit there and say one hundred percent that we are counting on them, no, sir.  That would be an example of that when we didn't count on them one hundred percent.

Q.   Yes.

A.   But yes, sir.  But in the spirit, yes, sir.  We are looking at them to help us provide and the direction for the medical care of the inmates within our policies and how we're running the county jail….

Q.   Okay.  So is it fair to say that you don't tell CHC what to do with the money that the county gives them?

A.   No, sir.

Q.   They basically have to allocate their resources in accordance with their medical expertise.

A.   Yes, sir.  And I would imagine the amount given to them in the contract.  But how they choose to do that would be to them.

Q.   Well, let me just ask.  Either you or – or your designee, whether it's an individual or whether it's a contractor, either you or your designee is responsible for making policies for the operation of the jail; right?

A.   Yes, sir.

Q.   And with respect to medical policies and procedures and medical decisions, that area of policy making, you have delegated that to the medical contractor; right?

A.   I don't know -- I don't know.  You'd have to almost ask that again, Mr. Jones.  What I want to say is -- is we are looking for the medical provider --

Q.   Uh-huh.  (indicating in the affirmative)

A.   -- I'll just concentrate on that one, because that's what we're talking about.

Q.   Right.

A.   To provide the care for the inmates.

Q.   Right.

A.   And it needs to be done within – within conjunction with how we do the jail operations.

Q.   Uh-huh.  (indicating in the affirmative)

A.   And that's how I look at that.

Q.   But they're the ones that make the decision as far how the medical services are provided.

A.   I would think -- yes, sir.  I would think so.  I mean, I'm not -- I'm not telling them how to -- I'm not trying to be funny about it.  I'm not telling them how to take the blood pressure and things like that.

Q.   I understand.  Unless you're back -- you know, back in the good old days when you had a hundred and fifty-nine sheriffs -- actually it was more back then, but some of the counties went bankrupt during the depression.  But you had counties you had one sheriff.  You'd have one horse, and you'd have one jail cell; right?

A.   I would imagine so.

Q.   And if I just -- if I just had a hangover, you'd have to call a doctor for me;

wouldn't you?

A.   I would imagine that's how they did it back then.

Q.   Well, then things got bigger, and you had an in-house health services administrator who would take care of medical needs; right?

A.   Yes, sir.  I can only speak since 1988.  We have always had some medical --

Q.   Right.

A.   -- staff at the jail.

Q.   Right.  And so now what they -- what the City does -- or used to be the county, now it's the consolidated government -- they contract – or actually you contract, and they pay for a – a contractor that specializes in providing medical services --

A.   Yes, sir.

Q.   -- to take care of that function that back in the horse and buggy days you would have had to take care of yourself; right?

A.   Yes, sir.  We're looking for them to provide that expertise.

Q.   Okay.  And you really -- since you're not a doctor and you're not a medical center, you're really not a medical administrator, **you're not in any position to give any kind of meaningful review or oversight to the day-to-day medical decisions that they make; right?  You have to defer to them on that.**

**A.   I guess so on that, yes, sir, Mr. Jones...**

(Doc. 38 - Darr Dep. 11-13, 49-51, 57-59, 60, 72-75) (emphasis added).

Under Georgia law, the duty of the sheriff to provide medical care to inmates in the county jail has been historically viewed as a county function, meaning that *Monell* liability can be imputed to the county for the unconstitutional denial of medical care by the sheriff or his deputies and jailers. As Judge Royal observed in *Robinson*, "every district court that has addressed th[e] issue has held that a Georgia sheriff acts as an arm of the county when providing medical care." 2014 U.S. Dist. LEXIS 41688 at *43; *accord Trammell v. Paxton*, No. 2:06-CV-193, 2008 U.S. Dist. LEXIS 108528, at *49 (N.D. Ga. Sept. 29, 2008) (O'Kelley, J.) (explaining that the decisions in *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1318 (N.D. Ga. 2006) and *Manders v. Lee*, 338 F.3d 1304, 1319, 1322 (11th Cir. 2003) (*en banc*) "suggest that in providing medical care for jail inmates, a sheriff acts as an arm of the county"); *see also Johnson v. Forsyth Cnty. Bd. of Comm'rs*, No. 2:14-CV-00173-RWS-JCF, 2015 U.S. Dist. LEXIS 52430, at *9 (N.D. Ga. Mar. 10, 2015). That is an important distinction

because *Manders v. Lee* held, in the excessive force context, that the sheriff is acting as an arm of the state when it comes to law enforcement functions, which means the county cannot be held liable under *Monell* for use of force in the jail, but it can be held liable for defective policies and decisions by policymakers in the jail medical context.

In its brief, the county points to a recent Eleventh Circuit panel decision that is seemingly inconsistent with the *en banc* opinion in *Manders v. Lee*, *supra*.   *Lake v. Skelton*, 840 F. 3d 1334 (11th Cir. 2016).[6]  The *Lake* decision holds that the sheriff's responsibility for feeding inmates is a state rather than county function when it, which CCG argues should also apply to the provision of medical care to inmates in the county jail because both food and medical care are mandated by the same statute.  While Plaintiffs agree that that both duties flow from the same statute, it is likely that *Lake* will be overturned.  Not only is it inconsistent with the dicta of *Manders* which differentiates the sheriff's state law enforcement duties from his obligations to provide medical care and other inmate needs, but it is also inconsistent with the ruling of "every district court that has addressed the issue" in Georgia.  An *en banc* petition has been filed in *Lake*, and there is a good chance it will be granted given the fact that the decision is such an outlier and – despite the fact the case turns on an understanding of Georgia law – none of the judges on the panel that decided it are Georgia lawyers. In any event, *Lake* deals with food rather than medical care, and this Court is urged to follow District and Circuit precedent which currently deems the medical care of inmates to be a county function for which *Monell* liability can be imputed to the county under appropriate circumstances.

---

[6] CCG states in its brief that the *Lake* court was "relying on *Manders v. Lee*," but actually *Lake* is contrary to dicta in *Manders* treating the care and feeding of inmates as a county function – separate and apart from the sheriff's law enforcement function as an arm of the state.  (Doc. 31-13, p. 9).

## <u>CONCLUSION</u>

For the reasons set forth in the foregoing argument of law and citation of authority, Plaintiffs request that all of the Defendants' summary judgment motions regarding Plaintiffs' claims against Defendants be denied; alternatively, should those motions be granted as to the federal civil rights claims, Plaintiffs request that the state law claims be dismissed without prejudice so that they can be refiled in the State Court of Muscogee County.

Respectfully submitted this 19th day of January, 2017.

*/s/ Craig T. Jones*
_____

Craig T. Jones
Georgia Bar No. 399476
Counsel for Plaintiffs

THE ORLANDO FIRM, P.C.
315 West Ponce De Leon Avenue
Suite 400
Decatur, Georgia  30030
(404) 373-1800
craig@orlandofirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served the foregoing PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT upon the following counsel via electronic filing:

James C. Clark, Jr.
LaRae D. Moore
Alex M. Shalishali
Tyler C. Cashbaugh
PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.
1111 Bay Avenue, Third Floor
Columbus, Georgia 31901

Thomas E. Lavender, III
Alison L. Currie
FISHER BROYLES LLC
945 East Paces Ferry Road NE
Suite 2000
Atlanta, Georgia 30326

Anna Burdeshaw Fretwell
David L. Mize
HUFF, POWELL & BAILEY, LLC
1214 First Avenue
Suite 320
Columbus, Georgia  31901

This 19th day of January, 2017.

*/s/ Craig T. Jones*

_____

CRAIG T. JONES
Ga. Bar No. 399476
Attorney for Plaintiffs