**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| **TIMOTHY CHESTNUT, ET AL.** <br> **Administrator, et al.** <br><br> **Plaintiffs,** <br> **v.** <br><br> **CORRECTIONAL HEALTHCARE COMPANIES, ET AL.** <br><br> **Defendants** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **CASE NO. 4:15-CV-166** |

**EXPERT REPORT OF DR. MENDEL**

I am Doctor Lawrence Mendel and have been retained on behalf of the plaintiffs in this case to review the issues with regard to the medical care provided to Lori Carroll during her incarceration in October of 2013. Compensation for this work is being billed at $350 per hour. I charge $450 per hour for deposition or trial time. In the following paragraphs I have summarized my background and experience in correctional medicine as a prelude to the report.

I have practiced medicine for 31 years. I worked as an emergency medicine physician ffrom 1983 through 1988. My experience in correctional care began in 1986, and I have continued to be involved in some aspect of correctional medicine since that time. My work has included clinical and administrative duties in several jail and prison systems. From 1988 through 1999, I was the Medical Director of the Ohio prison system, leaving that position to work as a correctional and telemedicine consultant. I have three publications that pertain to correctional medicine in the past ten years.

I returned to work with the Ohio prison system in 2006 as the Acting Medical Director for the department pending recruitment of a Medical Director. In 2007 I became the Assistant Medical Director. In 2011 I switched to part-time status with the department primarily working at the Corrections Medical Center urgent care. I retired from the Ohio prison system in November of 2014 because of a pending change in the pension system.

I am Board Certified in Family Practice and a Fellow of the American College of Correctional Physicians. Since 2012 have been The Medical Director for the Leavenworth Detention Center in Leavenworth, Kansas. I am a Clinical Assistant Professor at the Ohio University Heritage College of Osteopathic Medicine. I am also under contract with the Missouri Department of Corrections to conduct mortality reviews and provide other consultative services.

Other applicable correctional experience includes fourteen years as an accreditation surveyor with the National Commission on Correctional Healthcare. I am a Certified

Correctional Healthcare Professional, and a member of three national correctional healthcare organizations. I regularly attend correctional medical conferences and have participated in more than thirty during my time in correctional care.

In my capacity as a consultant and accreditation surveyor, I have worked with correctional systems in 21 states. During my work as a consultant and accreditation surveyor, I have worked with thirty-three jails in 16 states. I have audited medical care treatment in 25 jails and was hired as a consultant twice by the Georgia Department of Corrections and a jail in the Atlanta area.

In the past ten years, I have testified in five cases, and have been deposed in twenty-nine. My publications are listed in my C.V. I am familiar with the standard of care and reasonable practice of correctional healthcare. All opinions contained in this report are held to a reasonable degree of medical certainty.

**I. Documents reviewed**

1. Initial complaint, dated October 22, 2015
2. Jail Medical records
3. Investigation report

**II. Chronological Summary**

Lori Carroll was booked into custody of the Muscogee County Jail on the morning of October 22, 2013. She had been arrested after police received reports of an individual who was randomly opening the doors of occupied vehicles and wandering around in a confused and disoriented state. Carroll told the arresting officer that she had been on Xanax and other prescription medications. They called EMS, but she refused evaluation. Instead, she was taken into custody and charged with disorderly while intoxicated.

Upon arrival at the jail, she was seen by a booking officer. Facility videos indicate that at 9:12 a.m. she told the booking officer that she wanted to go to the doctor. A receiving screening form was completed at 11 a.m., but it does not appear she was seen by a physician. This record indicates that she was taking Xanax, Lorocet, Promethazine, and Soma but the time of the last dose is not recorded. Detox watch was not initiated.

The intake form indicates there was no history of medication allergy. Also recorded was a denial of past history of drug withdrawal, current withdrawal symptoms or hallucinations but prior records noted a history of withdrawal from Xanax. Vital signs were normal with the exception of an increased respiratory rate. The evaluator marked that she appeared to be anxious, but no tremors were seen. A history of bipolar disease, PTSD, and Panic disorder was obtained.

Entries from prior incarcerations were included in the records that I reviewed. Custody records list 14 incarcerations dating back to 1994. Medical records dated back to 2009 and show a past medical history of chronic neck pain, bipolar disorder, generalized anxiety disorder, and substance abuse but no history of psychotic behavior. Several of the jail deputies told the investigator that they recognized Carroll from prior incarcerations but that her behavior was

different from their previous interactions. Her records reflect prior use of Alprazolam and she was prescribed this medication at a dose of 0.5 mg three times a day during three incarcerations in 2011 and 2012 and also during two incarcerations in 2013.

A mental health assessment form was partially completed on the 22nd by Dr. Nandamura, a facility psychiatrist. The document notes that Carroll refused to come to the door. Observations at that time indicate that she was not oriented to person place or time. Her appearance was assessed as inappropriate and eye contact was poor. The observer was unable to assess her thought process. Dr. Nandamaru had seen Carroll during prior incarcerations but it does not appear that he reviewed prior records. Despite her disoriented condition, no exam was conducted, no diagnostic tests were ordered, and no treatment plan was established.

During the night, she began hallucinating and this continued into the next day. Transcripts from security videos indicate that at 1:28 a.m. she was heard yelling that there was a man in her cell that was trying to rape her. Despite her worsening condition, she not was seen by any medical or mental health staff until 4:11 a.m. and this interaction only lasted 26 seconds.

Throughout the day on October 23, various medical personnel passed through the housing unit and some briefly looked into Carroll's cell, but there is no record she was formally assessed. One nurse was heard on tape at 1:15 p.m. accusing Carroll of faking her behavior.

Dr. Nandamaru completed another mental health assessment around 6 p.m. on the 23rd. At this time, Carroll was observed to be actively hallucinating. Withdrawal was considered as a possible cause and in a later statement to the investigator he indicated that an Ativan injection was ordered for that reason. An interview with Nurse Woods who was on duty at the time states that she was instructed to obtain vital signs but no specific monitoring plan was found in the medical records produced to date.

Under orders, Dr. Nandamaru wrote to "R/o withdraw" but no specifics how this is to occur or how often she should be evaluated. In contrast, during prior incarcerations, a detailed treatment plan was established. One such form, dated October 12, 2011 was completed even though it notes that Carroll was due to depart the facility soon.

At 8:24 p.m. she was observed deliberately falling off a bench onto the floor by Deputy Gilliland. It is unclear what action was taken. Carroll was escorted to the medical area at 9:10 p.m. where she received an injection. By that time, she had already sustained facial injuries.

In the medical area, she was seen Nurse Woods. Her chart entry notes that she was unable to understand Carroll. On the section marked objective, she wrote that she was unable to take vital signs because Carroll was uncooperative. In the section under assessment no diagnosis is recorded. There is an entry that Nurse Woods observed that Carroll had a "broken area" on the bridge of her nose but that it was not examined because Carroll was "very uncooperative".

Injections of Ativan and Haldol were administered involuntarily by Nurse Woods around 9:20 p.m. with assistance from custody staff who restrained Carroll. It does not appear that she re-evaluated Carroll after the injection. These medications had apparently been ordered around 6 p.m. It is unclear why the injections were not given earlier.

Less than an hour later, Deputy Griggs reported that Carroll appeared to be "in shock". Nurse Woods responded and arrived in the area. In the cell she observed that Carroll had been incontinent of urine and had smeared blood on the walls but there is no record of a medical evaluation. Carroll was reportedly placed on "high suicide precautions" at this time. After Nurse Woods and the officers left the cell, they heard a loud noise and found her lying on the floor.

At 10:13 p.m. there is another medical entry. The chart notes that Carroll had hit her head and that a nodule was seen on the right side of her forehead. No palpation of the area is recorded and vital signs were not obtained because Carroll was still uncooperative. Aspects of the physical exam customary after an observed head injury were not completed.

Dr. Nandamaru was notified and informed that Ms. Carroll remained uncooperative. An order for an injection of 2 mg of Ativan was issued. However, even though it was apparent that she had injured herself, no orders are recorded about provisions for monitoring or follow-up assessment.

Interviews recorded by the investigator state that at 10:11 p.m. Sgt. Brundage and Nurse Woods discussed putting Carroll into a restraint chair and that Woods requested that Carroll be placed into a restraint chair. However, that the custody staff was unclear about the approval process or who was authorized to order restraint chair placement. Custody staff deferred the decision to Nurse Woods but she would not make a decision. It is unclear from the report whether Dr. Nandamaru was consulted. Ultimately it was decided to defer the decision and proceed with another injection.

During the night, Carroll was seen briefly every 10 to 15 minutes by custody staff. Medical personnel passed through the medical unit and briefly glanced into the cell, but Carroll was not examined it does not appear that vital signs were checked. The duration of these interactions was insufficient to determine whether additional treatment was needed and whether she was continuing to harm herself.

On the morning of October 24, Carroll was found unresponsive lying naked on the floor. She was pulseless. Pupils were fixed and dilated. Resuscitation efforts including an AED were initiated but were not successful. The statement that Nurse Bennett gave to the investigator reports that Carroll was "stiff in the jaw and face" and that her arms were cold to the touch suggesting that she may have been dead for a considerable time before she was found unresponsive.

At autopsy, the coroner found massive hemorrhaging in the head and fractured ribs that had punctured a lung. Because of the extent of the injuries, homicide was the initial impression. The primary cause of death was judged to be the pneumothorax and the head injuries were also felt to be a factor.

After the death, an investigation was initiated by the Muscogee County Sheriff's Office. The investigators reported that Carroll had been housed by herself but that there was evidence of multiple injuries. Her knees, elbows, wrists and hands were severely bruised. She had "large amounts of dried blood on her face" from a laceration on her nose and there were several large protuberances with contusions on her forehead and temples.

**III. Analysis**

From the moment Lori Carroll came into contact with the criminal justice system, it was apparent that she was confused and that medical evaluation was required. The officers on the scene called EMS but she refused evaluation. It is unclear whether any determination was made whether she was competent to refuse care. Instead of medical treatment, she was arrested. At the jail, she told the booking officer that she wanted to go to the doctor but she was not seen by a physician until that evening when Dr. Nandamaru saw her briefly for a mental health evaluation.

Dr. Nandamaru had seen Carroll in the evening of her first night in the jail, but did not order any diagnostic tests or treatment for her disoriented condition and did not make any diagnosis. Roughly eight hours later, she began hallucinating but it does not appear that any mental health staff were notified and no treatment was started. Instead of evaluation or treatment, at least one nurse accused her of faking behavior. This was certainly not the type of evaluation or treatment that she would have received in a hospital where she belonged.

Carroll had numerous prior incarcerations at the facility but had never exhibited acute psychosis. Acute psychosis can be caused by a number of very dangerous medical conditions including infectious conditions that can put other jail detainees and staff at risk. Despite her condition, no medical evaluation occurred and her temperature was never checked.

Withdrawal form Xanax is one dangerous condition that is well known to cause disorientation and hallucinations. Lori Carroll told the arresting officer and the intake nurse that she had been taking Xanax and this information was widely available from her old jail medical records. Drug withdrawal was also considered as a possible cause of her worsening condition by Dr. Nandamaru who wrote that he planned to give Ativan around 6 p.m. But only a single dose of Ativan was ordered but it was administered until 10:13 p.m., 36 hours after she had requested to see a physician. By this time she had already sustained multiple injuries caused by her psychotic behavior.

Carroll was first observed falling off a bench onto the floor at 8:24 p.m. on October 23. By the time that she had any medical intervention, almost an hour later she had sustained facial injuries. The laceration that she sustained probably needed sutures but she was not sent to a hospital. She was not examined at that time because the nurse on duty did not know how to examine an "uncooperative" patient and it does not appear that anyone at the facility had appropriate training to evaluate her condition. Carroll should have been sent to a hospital to evaluate her injuries and to prevent further injury.

She was returned to housing unit. Because of the self-injurious behavior and psychotic state, she should have been placed on one-to-one observation with continuous monitoring but it does not appear that her status was changed. It also does not appear that she was re-evaluated to determine whether the injections administered at 9:20 p.m. were effective.

Less than an hour later, Carroll was observed to be "in shock" by jail deputies. Nurse Woods came to the area. Blood was smeared on the wall and Carroll was noted to have been

incontinent. Her physical condition was not evaluated and vital signs were not checked. She should have been sent to the hospital.

Later interviews reflect an awareness that her condition was out of control and use of a restraint chair was considered. Custody supervisors and the nurse on duty were unsure who had the authority to order use of the restraint chair but the interviews suggest that they felt it was warranted. Despite her continued agitation, one-on-one observation was not ordered. The investigative report also suggests that custody staff wanted to send Carroll to the hospital and were unaware that they had this authority even if medical staff disagreed.

Early the next morning, Lori Carroll was found unresponsive and could not be resuscitated. Description of her injuries by the investigator suggests that she sustained additional injuries during the night. The medical records show no evidence of any examination of her injuries or even vital signs after her intake screening almost 48 hours earlier.

The investigator wrote that based on the officers accounts and medical statements, there appeared to be a deliberate medical indifference of certain clinic personnel regarding Carroll's injuries. According to the report, Officers Tidd and Griggs both notified Nurse Woods about the swollen areas on her head and other concerns but that she "dismissed the information". Officer Tidd stated that Carroll's eyes were "big and black", suggesting a basilar skull fracture. The analysis of the investigator appears to have accurately summarized the treatment provided to Lori Carroll.

**IV. Conclusion**

1. Lori Carroll's death in custody of the Muscogee County Jail was the direct result of inadequate medical care and neglect. She was taken into custody with acute confusion that was never adequately evaluated or treated. Within 12 hours of arrival at the jail, she was seen by a facility psychiatrist who did not adequately evaluate her condition and did not initiate treatment. Less than 8 hours later, she was actively hallucinating.

2. Thirty-six hours after her incarceration, treatment still had not been started and she remained in an agitated and confused state. Deputies observed dangerous behavior that resulted in injuries.

3. Her injuries were numerous and readily apparent but were never evaluated even though custody staff judged her to be in shock. Not even vital signs were checked. The nature of her injuries suggests that her serious medical conditions would have been identifiable by limited exam.

4. Interviews show that the custody staff were aware of her dangerous behavior but did not take appropriate measures to assure her safety. Records suggest that she continued to sustain continued injury well after custody staff was aware of her dangerous behavior.

5. Xanax withdrawal was a possible cause of her confusion and hallucination but she was never appropriately evaluated, monitored, or treated for this problem.

6. The death of Lori Carroll in the custody of the Muscogee County Jail should never have occurred. Her psychosis was never adequately treated and her condition progressively deteriorated causing her to sustain multiple injuries. Her dangerous behavior was observed for hours but measures to protect her from harm were not implemented. Her injuries were readily observable but her physical condition was not evaluated or monitored. These injuries were treatable but the failure to evaluate and treat her injuries resulted in her death.

Discovery in this case is ongoing and I anticipate updating this report at the conclusion of the discovery process. I reserve the right to supplement or modify my opinions as additional information becomes available.

Lawrence H. Mendel, D.O., FACCP, CCHP

30 - December, 2015

Date

# Curriculum Vitae

**Lawrence H. Mendel, D.O., FSCP, CCHP**
**1255 N. Hamilton Road, #71**
**Columbus, Ohio 43230**

---

**I. Education:**

B.A., Kent State University, 1976

D.O., Ohio University, 1982

**II. Postdoctoral Training:**

Rotating Internship, Doctors Hospital,
Columbus, Ohio, 1982-3
Internal Medicine Resident, Doctors Hospital, Columbus, Ohio 1983-4

**III. Work Experience:**

Clinical Assistant Professor, Ohio University Heritage College of Osteopathic Medicine, May 2015 to present

Medical Director, March 2012 to present
Staff physician, July 2011 through March 2012
Leavenworth Detention Center
Leavenworth, Kansas

Clinical Assistant Professor, Ohio State University, Department of Family Medicine, October 2010 to October 2013

Urgent care and Telemedicine physician for Ohio Department of Rehabilitation and Correction
September 2010 to November 2014

Assistant Medical Director, Ohio Department of Rehabilitation and Correction, Columbus, Ohio
November 2007 through January 2011

Acting Medical Director, Ohio Department of Rehabilitation and Correction, Columbus, Ohio
November 2006 to November 2007

Staff Physician, Wholehealth Management Scotts Inc., Marysville, Ohio, and Longaberger Inc, Frazeysburg, Ohio, July 2006 to January 2007

Staff Physician, Ohio Reformatory for Women, Marysville, Ohio. May 2005 to July 2005, temporary contract to fill unanticipated vacancy

Consultant, Jackie Moore and Associates, July 2004 to February 2007

Clinical Assistant Professor, Ohio State University, Staff Physician at Franklin County Jail, Columbus Ohio. Under contract with Ohio State University. November 2001 to June 2004

Consultant on operational issues and cost containment strategies, North Carolina Department of Corrections, 2001-2002

Consultant on accreditation and operational issues, Franklin County Jail, Columbus Ohio, July-September 2001

Acting Regional Medical Director and consultant, Central Region, New York, January and February 2000

Medical Monitor under Federal Court consent decree, Northeast Ohio Correctional Center, Youngstown Ohio, December 1999-June 2001

Telemedicine Consultant, September 1999 to February 2007

Medical Director, Ohio Department of Rehabilitation and Correction, 1988 to September 1999

Emergency Medicine, Medcenter Hospital, Marion, Ohio, 1986-8

Emergency Medicine, Doctors Hospital, Columbus, Ohio, 1985-6

Emergency Medicine, Knox Community Hospital, Mt. Vernon, Ohio 1984-5

Emergency Medicine, Department Director, Galion Community Hospital, Galion, Ohio 1984-5

Emergency Medicine (parttime),

Doctors Hospital, Nelsonville, Ohio, 1983-4

**IV. Memberships:** Academy of Correctional Health Professionals

American Osteopathic Association



American College of Osteopathic Family Physicians

American College of Corrrectional Physicians

**V. Certifications**

Family Practice, American Osteopathic Board of Family Practice, expires 2023

Certified Correctional Healthcare Professional, National Commission on Correctional Healthcare

Fellow, American College of Correctional Physicians, 2004 to present

ACLS Instructor, October 2007 to 2013, ACLS Provider 2013 to present. Expires July 2017

**VI. Correctional healthcare training:** (chronological order)

Conference participant, National Conference on Correctional Healthcare, 1988-2001, 2003-15

Conference participant, American Correctional Association Winter 1989, Winter 1991, Summer 1995, 1996, 1998, 2000, 2004

Conference participant, American Correctional Health Services Association, 1989, 1991, 1992, 1993, 1999, 2000, 2005

Accreditation Surveyor, National Commission on Correctional Healthcare 1995-2007

**VII. Correctional healthcare technology projects:**

Clinical Director, Ohio State University-Ohio Corrections telemedicine program. The program was initiated in 1994 and is currently ranked as one of the largest telemedicine programs in the U.S.

Project Manager-NIJ sponsored correctional healthcare smartcard demonstration project in conjunction with Battelle Memorial Institute. Grant received 1997, program became operational in April 1998.

Consultant on telemedicine to Georgia Department of Corrections, 1998, Correctional Medical Services 1999-



2002 Project plans completed for state prison systems in West Virginia, Minnesota, New Jersey, and New Mexico

## VIII. Conference Presentations

National Conference on Correctional Healthcare, New Trends in Telemedicine, An Evolving Technoology, October 2013

National Conference on Correctional Healthcare, Involuntary Medical Treatment, October 2012

National Conference on Correctional Healthcare, Mortality Review: Transforming Lessons Learned Into System Change, October 2010

American Telemedicine Association, Tampa Florida, May 2004. Correctional Telemedicine Workshop.

National Institute of Corrections, Telemedicine and Emerging Technology, Longmont Colorado, July 2002

Columbus Academy of Osteopathic Medicine, "Telemedicine, Past, Present and Future", Dublin Ohio, April 2002

Telemedicine World 1999, Galveston Texas "Developing a business case for Telemedicine", April 1999

American Correctional Health Services Association, 1992, 1999, 2000

National Conference on Correctional Healthcare, 1991, 1998, 2010

Gulf Coast Conference on Correctional Healthcare, Galveston Texas, 1990. "Quality Assurance in Correctional Healthcare"

## IX. Publications

"Involuntary Medical Treatment in the Correctional Setting", **Correctional Health Care Report**, Volume 14, No. 5, July 2013 Civic Research Institute

"Evaluating Options for Bringing Imaging Procedures in House", **Correctional Health Care Report**, Volume 11, No. 5, July 2010 Civic Research Institute



"Technology in Correctional Medicine", chapter in Clinical Practice in Correctional Medicine, 2nd Edition, Mosby, Elsevier, 2006, Michael Puisis, D.O., Editor,

"Understanding Cost Issues in Telemedicine", **Desmoteric News**, Society of Correctional Physicians, 1999

"Correctional Telemedicine", chapter in **Management and Administration of Correctional Health Care**, Jacqueline Moore Editor, Civic Research Institute, 2003

"Disaster Planning", **Correctional Health Care Report**, Volume 3, No. 2, January 2002, Civic Research Institute

L. Mendel, Depositions and trial testimony, revised October 2015

1. Arnold Hudnall vs. U.S. Corrections Corporation
Case No. 95-CI-6184
Jefferson Circuit Court
Jefferson County
Louisville Kentucky
Deposition date July 31, 2000
Case Settled at time of trial

2. Laniece Moore vs. Joe Case, etal
Case No. 2:99-cv-109
U.S. District Court, Western District of Michigan, Northern Division
Deposition date 4/13/01
Trial date 4/24/02

3. Shirley Leach vs. Getnet Luka, M.D., etal
Case No. 24-C-01-002503
Circuit Court for Baltimore City
Baltimore, Maryland
Deposition date 5/30/02
Case settled pre-trial

4. Norman Long, et al vs. J.C. Johnson, et al
Case No. 86-C-104-E
U.S. District Court, Middle District of Alabama, Eastern Division
Deposition date 9/19/02

5. Ana Rigunis vs. Harry Lee et al
Case no 99-3787
U.S. District Court, Eastern District of Louisiana
Deposition date 10/11/02

6. William Peyton vs. Raymond Snyder, etal
Case No. A-012642
U.S. District Court, Southern District of Ohio, Western Division
Deposition date 5/12/03

7. Rickey Alexander, et al vs. Correctional Services Corporation etal
Case No. 236-187481-01
Tarrant County District Court, Ft. Worth, Texas
Deposition date 6/13/03
Testimony date 8/1/03

8. Paul M. Zarvis, vs. Albany County, et al.
Case No. 99-CV-1564
U.S. District Court, Northern District of New York
Judge Treece
Testimony Date January 26, 2004

9. Carolyn Wheeler vs. Prison Health Services
Case No. 24-C-02-006297
Circuit Court, Baltimore, Maryland
Deposition Date June 18, 2004

10. Sheila Proffitt vs. Prison Health Services
First Circuit Court for Davidson County, Tennessee
Case No. 0CC2199
Deposition Date February 11, 2005

11. Demetrius Williams vs. County of Orange, etal.
Case No. 03-CIV 5182
U.S. District Court, Southern District of New York
Judge Lisa Smith
Testimony Date January 26, 2006

12. Thomas Pavlik, etal, vs. City of Shaker Heights, etal.
Case No. 1:04CV2150
U.S. District Court, Northern District of Ohio, Eastern Division
Judge John Adams
Testimony Date January 31, 2006

13. Trisha Wakat, etal. vs. Montgomery County, Texas, etal
Case No. H-05-0978
U.S. District Court, Southern District of Texas, Houston Division
Deposition Date May 31, 2006

14. Linda Evans, etal. vs. Maricopa County, etal.
Case No. CV 2004-004221
Superior Court of the State of Arizona, Maricopa County
Deposition Date June 9, 2006

15. Hawa Abdi Jama, et al., vs. United States, etal.
U.S. District Court, For the District of New Jersey
Case No. 97-3093 (DRD)
Deposition Date November 7, 2006

16. Kimberly Grey, et al., vs. Hillsborough County Sheriff, et al.
Case No. 8:04-CV-2663-T-26MAP
U.S. District Court, Middle District of Florida, Western Division
Deposition Date December 15, 2006

17. Deana Ashby, etal. vs. Campbell County Wyoming, etal.
Case No. 05-CV-1998
U.S. District Court For the District of Wyoming
Deposition Date February 8, 2007

18. Orion Coley vs. Wexford Health Sources, etal.
CASE NO.:06-61239 CIV
U.S. District Court, Southern District of Florida
Deposition date September 6, 2007

19. Marilyn Dolliole vs. Charles Foti, Sheriff of the Parish of Orleans
Case No. 03-13402
Civil District Court for the Parish of Orleans, State of Louisiana
Deposition Date September 25, 2008

20. Jay Olson vs. Sherburne County etal.
Case No. 07-CV-04757
US District Court, District of Minnesota
Deposition date April 13, 2010

21. Melvin Robinson vs. Correctional Medical Associates, etal.
Case No. 1:09-CV-01509
U.S. District Court, Northern District of Georgia, Atlanta Division
Deposition date June 15, 2010

22. Veronica Thomas etal. vs. State of Arizona
No. CV2006-019681
SUPERIOR COURT OF THE STATE OF ARIZONA
Deposition date January 14, 2011

23. Marchello McCaster vs. Ramsey County Minnesota, etal.
Case No. 09-CV-3196
U.S. District Court, District of Minnesota
Deposition date March 7, 2011
Trial testimony December 3, 2012

24. Launice Walker, Administrator vs Cook County
Case No. 07-L-8892
Circuit Court of Cook County Illinois
Deposition date August 11, 2011

25. Patricia Sears, etal, vs. Sheriff Lee, etal.
Case No. 2008-3418
U.S. District Court, Eastern District of Louisiana

Deposition date November 11, 2011

26. Charles W. Smith vs. Paul Harvey, M.D., etal.
Case No. 2:10-cv-02160
U.S. District Court, Central District of Illinois
Deposition date February 22, 2012

27. Jose Ramos-Vazquez vs. Primecare, etal.
Case No. 09-364
U.S. District Court, Eastern District of Pennsylvania
Deposition date March 9, 2012

28. Monica Robinson vs. IDHS
Case No. 3:12-cv-00020-CAR
U.S. District Court, Middle District of Georgia
Deposition date November 8, 2012
Testimony date August 5, 2014

29. Candy Marcum vs. Scioto County, etal.
Case No. C-1-10-790
U.S. District Court, Southern District of Ohio, Western Division
Deposition date March 8, 2013

30. Subrina Harris vs. Southern Health Partners, etal.
Case No. 5:11-CV-22 (MTT)
U.S. District Court, Middle District of Georgia, Macon Division
Deposition date April 26, 2013

31. Jacob Mitchell vs. U.S., etal.
Case No. 10-7437
U.S. District Court, Eastern District of Pennsylvania
Deposition dates October 9 and 10, 2013

32. Gabrielle Hill, et al. vs. Sheriff Theodore Jackson, et al.
Case No. 2012-CV-217835
Superior Court of Fulton County, Atlanta Georgia
Deposition date November 1, 2013

33. Elleta Denson, et al. vs. Corizon, et al.
Case No. 1:12-cv-03890-SCJ
U.S. District Court, Northern District of Georgia, Atlanta Division
Deposition date November 8, 2013

34. Bridget Maxwell vs. Correct Care Solutions
Case No. 1:13-cv-00065-SCJf
U.S. District Court, Northern District of Georgia, Atlanta Division
Deposition date November 11, 2013

35. Sabrina Johnson et al. vs. Grady Hospital, et al.

Case No. 2012-CV-220051
Superior Court of Fulton County
Deposition date January 13, 2014

36. Richard Hinchman vs. State of West Virginia, et al.
Case No. 11-C-2198
Circuit Court of Kanawha County, West Virginia
Testimony date March 20, 2014

37. Victor Parsons, et al. vs.Charles Ryan, et al.
Case No. CV12-00601-PHX-NVW (MEA)
U.S. District Court, District of Arizona
Deposition date April 9, 2014

38. John Lipsey, et al. vs. U.S., et al.
Case No. 2:12-cv-2100
U.S. District Court, Northern District of Illinois, Eastern Division
Deposition date July 24, 2014

39. Taylor Hogan, et al. vs. David Nguyen, et al.
Case No. 2013A2364-5
State Court of Cobb County
Deposition date August 22, 2014

40. Yodi Zikianda vs. County of Albany
Case No. 1:12 CV-1194
U.S. District Court, Northern District of New York
Deposition date September 30, 2014

41. Gabe Hannahs vs. Dr. Carl Johnson
Case No. 4:11-CV-00278-JMM-JJV
U.S. District Court, Eastern Division of Arkansas, Western Division
Deposition date November 14, 2014

42. Debra and Earl Black vs. Eugene Youngue, M.D., et al
Case No. 14-505
U.S. District Court, Western District of Pennsylvania
Deposition date November 24, 2014

43. Shadney Hamer vs. County of Kent, et al.
Case No. 1:13-cv-00504-RHB-JGS
U.S. District Court Western District of Michigan, Southern Division
Deposition date December 1, 2014
Testimony date January 6, 2015

44. Eric Warner vs. State of New Hampshire, et al.
Case No. 217-2014-CV-102
State of New Hampshire Superior Court
Merrimack, SS
Deposition date February 5, 2015

45. Steven Phillips vs. Allegheny County, et al.
Case No. 2:13-CV-000685-MPK
U. S. District Court Western District of Pennsylvania
Deposition date April 15, 2015

46. C.G.W., et al. vs. Douglas County Wisconsin, et al.
Case No. #14-CV-468
U. S. District Court Western District of Wisconsin
Deposition date June 3, 2015

47. Wesam El-Hanafi vs. U.S., et al.
Case No. 13-CV-2072
U. S. District Court, Southern District of New York
Deposition date October 26, 2015

48. Paul Rembert vs. Kevin Cheverko, et al.
Case No. 12-CV-9196
U. S. District Court, Southern District of New York
Deposition date October 28, 2015

49. James Stevenson, et al. vs. Armor Correctional Health Services, et al.
Case No. 12-CA-009268
Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County Florida
Deposition date November 20, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of January, 2016, I mailed the following **EXPERT REPORT OF DR. LAWRENCE MENDEL** via the United States Mail with sufficient postage attached thereto to the following counsel of record:

James C. Clark, Jr.
Alex M. Shalishali
Tyler C. Cashbaugh
PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.
1111 Bay Avenue, Third Floor
Columbus, Georgia 31901

Thomas E. Lavender, III
Alison L. Currie
LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
1180 Peachtree Street
Suite 2900
Atlanta, Georgia 30309

Anna Burdeshaw Fretwell
David L. Mize
HUFF, POWELL & BAILEY, LLC
1214 First Avenue
Suite 320
Columbus, Georgia 31901

This 5th day of January, 2016.

CRAIG T. JONES
Ga. Bar No. 399476
Attorney for Plaintiff

THE ORLANDO FIRM, P.C.
Decatur Court, Suite 400
315 W. Ponce de Leon Avenue
Decatur, GA 30030
(404) 373-1800
craig@orlandofirm.com