Cheryl D. Wills, M.D., D.F.A.P.A.
General, Child, and Forensic Psychiatry
Board Certified
cwforensic@earthlink.net
(216)403-2784

October 14, 2016

Craig Jones, Esq.
The Orlando Firm, PC
315 W. Ponce de Leon Avenue, Suite 400
Decatur, GA 30030

Re: Timothy Chestnut, *et al v.* Correctional Healthcare Companies, *et al.*
Case NO 4:15-CV-166

**Psychiatry Expert Report**

Dear Attorney Jones:

At your request, I reviewed records pertaining to the October 22 - 24, 2013 incarceration of Lori Jones in the Muscogee County Jail to form an opinion about the quality of mental health care that she received prior to her death there on October 24, 2013.

**Qualifications of Evaluator:**
I have provided a copy of my *curriculum vitae* which lists my qualifications to perform this review.

**Sources of Information:**

1. The above listed complaint.
2. The December 24, 2013 report on the October 24, 2013 death of Lori Carroll authored by Investigators David Batsastini and Edwin Hill of the Muscogee County Sheriff's Office Investigations Division.
3. A January 30, 2015 autopsy report of Lori Carroll prepared by Dr. Kris Sperry, Chief Medical Examiner, Georgia Bureau of Investigation Division of Forensic Sciences.
4. An unsigned copy of the Restraint Chair Policy that was approved in June 2013.
5. Medical records from the Muscogee County Jail, including records that were received from community hospitals and providers.
6. Deposition of psychiatrist Dr. Sai Nandamuru, MBBS.
7. Deposition of Nurse Mary Woods, LPN.

8. Deposition of Sergeant Bradford Brundage.
9. Deposition of Corrections Officer Fonda Yolanda Griggs.
10. Deposition of corrections Lieutenant Catha Williams.
11. Deposition of former Corrections Officer Elizabeth Tidd.
12. Deposition and expert report of Lawrence H. Mendel, DO.
13. Deposition of Dr. Kris Sperry, MD
14. Expert report of Cindy Miller, MSN, APRN, BC, FNP.
15. Expert report of Tracey Reed, Independent Jail Consultant.
16. Expert Report of Joseph V. Penn, MD, CCHP, FAPA.
17. Correctional Healthcare Companies Clinical Protocols Clinical Protocol Revision including:
    1. Protocol A-12 Medical Housing Infirmary.
    2. Protocol C-03 Medications: Medication Guidelines.
    3. Protocol K-01 Neurology: Change in Behavior.
    4. Section L, Protocols L-01 – L-12 Mental Health.

REASONABLE MEDICAL CERTAINTY:

The following opinions are expressed to a reasonable degree of medical certainty, based on training, experience and knowledge that is generally accepted in the medical community. It is a clinical and scientific opinion but not a legal opinion.

1. It is my opinion with reasonable medical certainty that Lori Carroll's suffered from extreme, prolonged emotional and physical torture that she was unable to stop. The following statements support this opinion.

   a. Emotional torture

      1. The medical examiner correctly determined that Ms. Carroll was "not mentally capable of understanding that she is (sic) truly trying to kill herself." Thus, her actions were not rational, knowing, intelligent, or voluntary. Her death was not a suicide but was due to self-inflicted torture caused by a serious mental disorder that impaired her perceptions, thoughts, judgment, insight, and impulse control resulting in self-harm that she was unable to stop on her own.

      2. She was delusional (had a false, fixed belief) and truly believed that she was being tortured by others. She tried to stop the

torture but was unable to accomplish this on her own.

3. She repeatedly screamed at people that was not present; she was experiencing hallucinations that she was unable to stop on her own.

4. She pleaded for help, said that there were people in her cell and that there was a man in her cell wanting to rape her. She could not stop this on her own.

5. She begged for help from the corrections "police" and said that a woman (hallucination) in the cell was trying to rob and kill her (Ms. Carroll). When "the police" failed to help her, she repeatedly slapped the wall, where she believed the killer was - even after her hands hurt, bled and were severely bruised - because she desperately wanted to live. She could not stop the attack on her own.

6. Ms. Carroll repeatedly threw herself about the cell during a violent fight with her perceived torturers whom she believed were going to sexually defile and kill her. She wanted to live and she wanted to be safe but was unable to accomplish these goals on her own.

7. The medical examiner correctly concluded that Ms. Carroll experienced "extreme pain" and severe emotional distress from her injuries and her mental disorder prevented her from stopping the torture.

8. She desperately wanted someone to help her stop the ongoing torture but nobody responded when she pleaded for help.

9. Officer Crawford said that Ms. Carroll was "trying to fight something away from her face" when she was suffocating from a collapsed lung. She likely was trying to remove whatever she believed was impeding her

efforts to breathe normally and to reduce the "extreme pain" (from the shattered ribs) that she experienced when she tried to breathe while her lung collapsed in a two hour period. She had significant anxiety and feelings of helplessness, hopelessness, and worthlessness because she couldn't breathe well, had severe pain, was confined in a room with people (hallucinations) that continued to torture her, and nobody in the Jail helped her despite her pleading and begging for help. She fought back because she desperately wanted to live.

b. Physical Torture

1. Ms. Carroll repeatedly inflicted physical blows to her body with "impacts of great force" including "multiple falls over and over and over," repeatedly hitting her hands against a wall until they bled, and repeated head trauma. The bulk of the trauma occurred within a "five to six hour period." The physical trauma was "very, very painful" and compelled the medical examiner to question whether Ms. Carroll was "someone who was beaten to death."

2. It is my opinion with reasonable medical certainty that Dr. Nandamuru's care of Lori Carroll was grossly deficient, fell below the standard of care and contributed to the death of Lori Carroll. My reasoning is as follows:

a. Dr. Nandamuru knew that, like all healthcare professionals in the jail, he was required to know and practice consistently according to the Correctional Healthcare Companies Clinical Protocols, which include protocols for Mental Health care. He knew that Correctional Healthcare Companies was responsible for setting the treatment protocols in the jail and that he could not safely and responsibly provide mental health services, and collaborate with nurses and other healthcare providers in the Jail, unless he adhered to the same protocols and practices in that setting that they did.

As a board certified psychiatrist, Dr. Nandamuru knew that his failure to follow jail psychiatric protocols would compromise the safety and well-being of all individuals confined there, including Ms. Carroll. These individuals did not have the ability to seek competent mental health care elsewhere. Dr. Nandamuru's intentional decision to disregard the Clinical Protocols fell below the standard of care; it caused the unnecessary prolongation of Ms. Carroll's extreme self-torture and emotional pain and suffering that resulted in her death. The following statement support this opinion.

i. Dr. Nandamuru failed to follow protocol A12 - Medical Housing Infirmary - that describes the protocol for transferring person requiring "acute psychiatric management" to the medical infirmary for closer monitoring by nursing staff. The fact that he ordered injectable medication for Ms. Carroll affirms that she required this level of care.

   Had Dr. Nandamuru followed the protocol, Ms. Carroll would have received more frequent monitoring from nursing staff, her vital signs would have been checked at least every shift, and she likely would have been "classified as no improvement on three consecutive checks" which would have resulted her being "discharged" to a hospital - in accordance with the protocol - to receive a higher and more appropriate level of care. She would not have been subjected to prolonged self-torture and suffocation and she would not have died in the Jail.

ii. Dr. Nandamuru chose not to follow Protocol K01 - Change in Behavior which requires says "Do not assume that this is a psychiatric problem until the patient is medically cleared." Had he followed the protocol, he would have ordered a medical evaluation for Ms. Carroll, when he ordered injectable medication for her, which he did twice. This would have allowed the medical professional on call to determine how best to manage and monitor the physical injuries that ultimately resulted in Ms. Carroll's death.

iii. Dr. Nandamuru chose not to follow Protocol L02 - Acutely Psychotic Patients which requires the clinician to determine if there is "a previous mental health history." Had he done so, he would have realized that Ms. Carrol had a history of bipolar disorder and that the behavior that she was exhibiting, especially prior to the second dosage of injectable medication, did not fit the pattern of her behavior during previous detainments in the Jail. This would have resulted in more close monitoring, likely psychiatric hospitalization, alleviation of her symptoms and suffering without her dying alone while being physically and emotionally tortured by her perceived demons in a jail cell.

iv. Although Dr. Nandamuru suspected that Ms. Carroll may have been using recreational substances, such as bendzodiazepines (e.g. alprazolam (Xanax®), diazepam (Valium®), lorazepam (Ativan®), clonazepam (Klonopin®), etc.), he disregarded Protocol L06 - Benzodiazepine Addiction that would have required nurses to obtain vital signs at least three times daily for two days. The protocol would have resulted in nurses monitoring Ms. Carroll more closely. She may have been hospitalized due to her mental status changes, repeated-self torture, and the nurses "inability" to obtain her vital signs. If this had been done, she would not have died a slow, painful death in jail on October 24, 2013.

b. Dr. Nandamuru failed to follow Protocol L12 - Suicide Intervention that requires inmates "who are an immediate risk for suicide (Level 1) [to] be placed on a full suicide watch status with constant supervision . . . . If [the] facility is unable to provide 24/7 direct supervision, initiate transfer to an outside facility." Had this policy been followed, Ms. Carroll would have been watched constantly, with the cell door open, until she was reassessed by a psychiatrist or psychologist who would have determined if the level of precautions should have been adjusted. Corrections officers would have been in a position to halt the self-harm immediately, and Ms. Carroll would have been transferred to the hospital for further care before she died.

3. It is my opinion with reasonable medical certainty that Nurse Woods' psychiatric nursing care of Lori Carroll was grossly deficient, fell below the standard of care and contributed to the death of Lori Carroll. My reasoning is as follows:

a. Although Nurse Woods knew that she was required to follow the Correctional Health Care Companies Clinical Protocols for Mental Health care in the Muscogee County Jail, she made a conscious decision to disregard them. She knew that her failure to follow the protocols would compromise the safety and well-being of all individuals that were incarcerated there, including Ms. Carroll, because these individuals did not have the ability to seek competent care elsewhere. Nurse Woods' failure to comply fell below the standard of care and contributed to the unnecessary prolongation of Ms. Carroll's extreme self-torture, emotional pain and suffering, and death.

1. Nurse Woods Chose not to follow Protocol A12 - Medical Housing Infirmary, which permitted her to house Ms. Carroll in Medical Housing for acute psychiatric management, even though Ms. Carroll met the criteria for admission. Nurse Woods failed to obtain vital signs every shift and failed to notify a higher level medical provider when she was unable to do so. She also failed to consult with Dr. Nandamuru regarding discharging Ms. Carroll to the hospital even thought her "condition status has (sic) been classified as <u>no improvement</u> on three consecutive checks." Additionally, Nurse Woods failed to properly document and to communicate verbally her observations about Ms. Carroll, as is required by the protocol. This made it difficult for nurses who worked the next shift to ascertain the severity of Ms. Carroll's situation. Had Nurse Woods complied with the protocol, Ms. Carroll's emotional and physical torture in the Jail would have been halted because she would have been released to the hospital where she could receive proper care and she would not have died in the Jail on October 24, 2013.

2. Nurse Woods chose not to follow Protocol K01-Change in Behavior that required her to make "simultaneous referrals to medicine and psychiatry." The protocol also required Nurse Woods to obtain data about Ms. Carroll's past psychiatric history and the information was available in the Jail; Nurse Woods failed to do this. She was required but failed to note Ms. Carroll's "general appearance" including the bruises on Ms. Carroll's body, her "dark eyes," the response of her pupils to light, her speech patterns, and whether she could control her bowels and bladder.

   The conscious failure of Nurse Woods to document this information and to communicate it to other healthcare professionals fell below the standard of care and impeded consideration of psychiatric hospitalization for Ms. Carroll. This contributed substantially to Ms. Carroll's prolonged and unnecessary extreme emotional suffering and physical self-torture that preceded her death in the Jail.

3. Nurse Woods consciously disregarded Protocol L2 - Acutely Psychotic Patients, which required her to ascertain Ms. Carroll's previous mental health and substance misuse history. The Protocol also required Nurse Woods to assess Ms. Carroll's vital signs, how her pupils reacted to light and whether or not she had control of her bowels and bladder. Had Nurse Woods compiled, the medical professional on call, the psychiatrist, (Dr. Nandamuru) and the Health Services Administrator would have been aware of Ms. Carroll's incontinence and visual changes. Nurse Wood's failure to follow through with her professional obligations fell below the standard of care and contributed to Ms. Carroll's extreme, prolonged and unnecessary emotional and physical self-torture that resulted in her death in the Jail.

4. Nurse Woods consciously disregarded Protocol L11 - Psychiatric Medication, which required the following interventions for a patient who "is evidencing psychotic behaviors, is extremely agitated and presents a danger to self or others in an emergency situation:" obtain and document vital signs, orientation, "neuro check" and "history of head trauma if known." Nurse Woods was required to "document. . . the specific behaviors leading to the initiation of the medication" and to house Ms. Carroll "in an area where continuous monitoring is available." She was supposed to check Ms. Carroll 15 minutes after giving the medication and every hour thereafter." She was required to document these interventions and her observations. Nurse Woods was supposed to document the condition of Ms. Woods' extremities (arms and legs)in the identified space on the Psychiatric Medication Problem Oriented Record (POR). Also, the POR form that she was supposed to complete contains a section titled "Call Emergency Ambulance" to facilitate documenting the process of arranging for the patient to be hospitalized. Nurse Woods' failure to comply with the protocol for Psychiatric Medication fell below the standard of care and contributed to Ms. Carroll's prolonged and unnecessary emotional and physical self-torture and her death in the Jail.

5. Nurse Woods failed to follow Protocol L12 - Suicidal Intervention, which required her to place Ms. Carroll on a Level 1 full suicide watch with 24/7 direct supervision or to "initiate transfer to an outside facility" if there were not sufficient resources to monitor Ms. Carroll properly. Had Nurse Woods complied, Ms. Carroll would have been monitored more closely and would have been prevented from engaging in the violent and repeated physical and emotional self-torture that caused her to die. Nurse Wood's actions

fell below the standard of care and contributed to Ms. Carroll's death.

6. Nurse Woods' failure to consider use of the restraint chair when asked to do so represents an exercise in poor judgment and would not have contributed to Ms. Carroll's death had Nurse Woods complied with the Correctional Healthcare Companies Clinical Protocols for Mental Health. Thus, her failure to properly review the request for a restraint chair, including the situation which resulted in the request, with Dr. Nandamuru fell below the standard of care and contributed to Ms. Carroll's repeated and prolonged physical and emotional self-torture that ended in her death.

**LIMITATIONS OF REPORT:**
The opinions expressed in this report are based on the information that was made available to me at the time of the report. If additional information becomes available that may cause me to revise my opinion, I reserve the right to submit an addendum to this report.

Respectfully Submitted,

Cheryl D. Wills, M.D.